HAROLD J. KANAVOS vs. HANCOCK BANK AND TRUST
COMPANY.

Suffolk.    May 12, 1982. — August 23, 1982.

Present: DREBEN, ROSE, & KASS, JJ.

*Agency*, Scope of authority.  *Corporation*, Officers and agents.  *Banks and Banking*.

A jury finding that a bank's executive vice president had authority to modify a loan or workout agreement in a manner that did not fundamentally alter the agreement would have been warranted by statements in a description of his position, which had been prepared for the bank by a personnel consultant, and which was in evidence as an exhibit in an action by which the borrower sought to impose liability on the bank.  [329-331]

A jury finding that a bank's executive vice president had apparent authority to modify a subsidiary aspect of a loan or workout agreement with which the borrower sought to charge the bank, would have been warranted by evidence that during the long course of negotiations the bank's president had encouraged the plaintiff to deal with the executive vice president; that the executive vice president had earlier amended the agreement on behalf of the bank on material points; that the nature of the change in the terms of the agreement now repudiated by the bank was secondary, rather than fundamental, when measured against the context of the over-all transaction; and that the bank had given its executive vice president broad operating authority over the central asset of certain stock which the borrower had transferred to the bank.  [331-333]

CIVIL ACTION commenced in the Superior Court on May 12, 1977.

The case was tried before *O'Connor*, J.

*Nicholas A. Abraham* for the plaintiff.

*James R. DeGiacomo* for the defendant.

KASS, J.    At the close of the plaintiff's evidence, the defendant moved for a directed verdict, which the trial judge allowed.  The judge's reason for so doing was that the

plaintiff, in his contract action,[1] failed to introduce sufficient evidence tending to prove that the bank officer who made the agreement with which the plaintiff sought to charge the bank had any authority to make it. Upon review of the record we are of opinion that there was evidence which, if believed, warranted a finding that the bank officer had the requisite authority or that the bank officer had apparent authority to make the agreement in controversy. We, therefore, reverse the judgment.

On appeal from a judgment based on a directed verdict for the defendant, the test is whether the evidence, taken in a light most favorable to the plaintiff, was sufficient to support an inference of facts imposing liability on the defendant. *Gelinas* v. *New England Power Co.*, 359 Mass. 119, 123 (1971). *Poirier* v. *Plymouth*, 374 Mass. 206, 212 (1978). *Graci* v. *Massachusetts Gas & Elec. Light Supply Co.*, 7 Mass. App. Ct. 221, 222-223 (1979). We review the facts which the jury could have found.

For approximately ten years prior to 1975, Harold Kanavos and his brother borrowed money on at least twenty occasions from the Hancock Bank and Trust Company (the Bank), and, during that period, the loan officer with whom Kanavos always dealt was James M. Brown. The aggregate loans made by the Bank to Kanavos at any given time went as high as $800,000.

Over that same decade, Brown's responsibilities at the Bank grew, and he had become executive vice-president. Brown was also the chief loan officer for the Bank, which had fourteen or fifteen branches in addition to its head office. Physically, Brown's office was at the head office, toward the rear of the main banking floor, opposite the office of the president — whose name was Kelley. Often Brown would tell Kanavos that he had to check an aspect of a loan transaction with Kelley, but Kelley always backed Brown up on those occasions.

---

[1] In an amendment to his complaint, the plaintiff also alleged breach of trust and fraud, but those claims were a variation on the plaintiff's main theme: that the bank had not adhered to an agreement.

In 1974 there was a real estate recession, and the Kanavos brothers suffered reverses. The Bank, through Brown, explored means by which the Kanavos brothers might liquidate $300,000 in unsecured loans with the Bank. One of the more valuable assets in the Kanavos portfolio was a relatively new apartment building at 1025 Hancock Street in Quincy called Executive House. Title to that property was held by 1025 Hancock Street, Inc. (1025, Inc.), in which the Kanavos brothers had owned all the stock. They had, however, pledged that stock and, at the time of the discussions with Brown, the pledged stock had been foreclosed, subject to the right of the Kanavos brothers to redeem it.

Brown had loan workout responsibilities for the Bank, and the deal Brown and Kanavos devised was that the Bank would lend Kanavos an additional $265,000 so that he might buy back the foreclosed shares of 1025, Inc., and those shares would, in turn, be sold to the Bank in consideration of $522,322.21, and so liquidate the Kanavos indebtedness to the Bank. Kanavos was to have the option to buy back the shares of 1025, Inc. for the same price, plus a daily charge.[2] If the Bank were to sustain operating losses during the option period, those would be added to the repurchase price; operating profits would be a credit against the purchase price, but not in excess of the daily charge. It could be inferred that the daily charge was in lieu of interest which the Bank would have earned on its $522,322.21.

The details of this moderately sophisticated transaction[3] were negotiated on behalf of the Bank by Brown. The

[2] In the executed agreement which resulted, the daily charge was referred to as $143.10 and $141.10 in the same sentence. The discrepancy became academic in light of an amendment to the agreement.

[3] There was evidence that the sale of the stock and option to buy it back were in lieu of a second mortgage. The Executive House property was subject to a mortgage insured by the Federal Housing Administration, and a second mortgage would have been a violation of the terms of that mortgage. There was also evidence that the Bank viewed its holding of the shares of 1025, Inc., as incident to the workout of the Kanavos loans.

transaction was submitted to the Bank's board of directors and approved. Kelley, not Brown, was present at the execution of the agreement for the sale and purchase of the shares of 1025, Inc., and signed the agreement on behalf of the Bank. On March 5, 1975, shortly after the transaction involving the shares of 1025, Inc., had been concluded, Kanavos and the Bank amended the agreement so as to: increase the purchase price by $53,000; increase the optional repurchase price by the same amount to $575,322.21; and increase the daily charge to be added to the repurchase price to $157.62. This amendment was negotiated for the Bank entirely by Brown; Brown signed it; Kelley played no part in connection with the amendment; and neither the board of directors of the Bank, nor any committee of the board, were in any way involved with the amendment.

Upon transfer of the 1025, Inc., stock to the Bank, Brown was elected president and treasurer of 1025, Inc. and assumed responsibility for operation of its asset, the Executive House. From time to time Kanavos inquired with Brown about details of operation of the Executive House, especially financial statements. These were subjects in which Kanavos maintained a lively concern because he hoped to buy back the shares of 1025, Inc. For a seventeen-month period following the closing in February, 1975, Kanavos met with Brown about once a month to discuss the Executive House property.

In the course of trying to arrange financing for the repurchase of the 1025, Inc., shares, Kanavos sought to introduce potential financing sources to Kelley. Kelley told Kanavos to deal with Brown. There were other occasions when Kelley told Kanavos that he should deal with Brown and, indeed, Kelley thereafter never dealt with Kanavos. Two secretaries at the Bank gave testimony from which the jury could conclude that Kelley concerned himself largely with internal administration of the Bank and the Bank's relationship to the community (e.g., Chamber of Commerce activity), while Brown administered the Bank's

loans. Kelley was aware that Brown was meeting with Kanavos about his repurchase option.

When Kanavos asked Brown for operating statements of 1025, Inc., the latter made excuses for not producing them. A cat and mouse game concerning financial information went on for some months and, as Kanavos became more insistent, Brown said to Kanavos that he preferred that Kanavos not exercise the repurchase option at all and that he would make it worth his while not to. Brown said he would go back to Kelley to see what offer he could make.

Kanavos was never permitted to introduce in evidence the terms of the offer Brown made. That offer was contained in a writing, dated July 16, 1976, on bank letterhead, which read as follows: "This letter is to confirm our conversation regarding your option to re-purchase the subject property. In lieu of your not exercising your option, we agree to pay you $40,000 representing a commission upon our sale of the subject property, and in addition, will give you the option to match the price of sale of said property to extend for a 60 day period from the time our offer is received." Brown signed the letter as executive vice-president. The basis of exclusion was that the plaintiff had not established the authority of Brown to make with Kanavos the arrangement memorialized in the July 16, 1976, letter.

Among the exhibits introduced was a document which Brown identified as his job description.[4] In broad terms he was to manage the commercial and consumer loan division. In furtherance of a duty to develop and maintain "a profitable loan portfolio," he, "personally, or through subordinates," was to "direct the resolution of particularly complex and or unusual credit, lending or collection problems related to important customers." He was also to "[m]aintain a continuous review of the loan portfolio and oversee the resolution of significant delinquent and workout loans."

---

[4] The Bank had invited a consultant to survey its organizational structure and to redefine the responsibilities of its officers.

That language sketches an authority to alter a subsidiary aspect of a loan or workout agreement. Restatement (Second) of Agency § 33 (1957) ("An agent is authorized to do, and to do only, what it is reasonable for him to infer that the principal desires him to do in the light of the principal's manifestations and the facts as he knows or should know them at the time he acts"). See also §§ 34 and 35 relating to circumstances considered in interpreting authority and when incidental authority is inferred. The jury could have believed that the sale of stock with repurchase option was a furtherance of a workout arrangement (see note 3, *supra*) and Brown's job description would have supported a jury finding that he had authority to amend the repurchase option in a manner that did not fundamentally alter the agreement, that is, to substitute for the price certain in the agreement, as amended, a right of last refusal or a cash payment should the property be sold to someone else. It was a revision which afforded the Bank a chance to realize more money from the 1025, Inc., stock; it did not commit the Bank to a loan in excess of Brown's lending authority, to a sale or purchase of property of the Bank, or any step which, in the business context, was so major or unusual that a businessman in Brown's position would reasonably expect to require a vote of the board of directors. See *England Bros.* v. *Miller,* 274 Mass. 239, 241 (1931); *Choate* v. *Assessors of Boston,* 304 Mass. 298, 300 (1939); *Stern* v. *Lieberman,* 307 Mass. 77, 81 (1940); *Markarian* v. *Simonian,* 373 Mass. 669, 674 (1977).

Whether Brown's job description impliedly authorized the right of last refusal or cash payment modification is a question of how, in the circumstances, a person in Brown's position could reasonably interpret his authority. Whether Brown had *apparent authority* to make the July 16, 1976, modification is a question of how, in the circumstances, a third person, e.g., a customer of the Bank such as Kanavos, would reasonably interpret Brown's authority in light of the manifestations of his principal, the Bank. See *Neilson* v. *Malcom Kenneth Co.,* 303 Mass. 437, 441 (1939), adopting

the Restatement view; *Weisman* v. *Saetz*, 11 Mass. App. Ct. 440, 442 (1981); Restatement (Second) of Agency §§ 8, Comment c, 27 & 49, Comment c (1957). See also 2 Fletcher, Cyclopedia of the Law of Private Corporations §§ 449 & 452 (rev. perm. ed. 1982).

Titles of office generally do not establish apparent authority. *James F. Monaghan Inc.* v. *M. Lowenstein & Sons*, 290 Mass. 331, 333 (1935) (vice-president had no apparent authority to authorize preparation of plans for a finishing mill). *Kelly* v. *Citizens Fin. Co. of Lowell, Inc.*, 306 Mass. 531, 532-533 (1940) (president did not, by virtue of the office alone [i.e., in the absence of evidence as to general authority, implied or apparent], have apparent authority to hire a lawyer for his company). Brown's status as executive vice-president was not, therefore, a badge of apparent authority to modify agreements to which the Bank was a party.

Trappings of office, e.g., office and furnishings, private secretary, while they may have some tendency to suggest executive responsibility, do not without other evidence provide a basis for finding apparent authority. See *Sheldon* v. *First Fed. Sav. & Loan Assn.*, 566 F.2d 805, 808-809 (1st Cir. 1977). Apparent authority is drawn from a variety of circumstances. *Lord* v. *Lowell Inst. for Sav.*, 304 Mass. 212, 214 (1939). Thus in *Federal Natl. Bank* v. *O'Connell*, 305 Mass. 559, 562, 565-567 (1940), it was held apparent authority could be found because an officer who was a director, vice-president and treasurer took an active part in directing the affairs of the bank in question and was seen by third parties talking with customers and negotiating with them. In *Costonis* v. *Medford Housing Authy.*, 343 Mass. 108, 114-115 (1961) (but with Whittemore, Spalding and Cutter, JJ., dissenting), the executive director of a public housing authority was held to have apparent authority to vary specifications on the basis of the cumulative effect of what he had done and what the authority appeared to permit him to do. See also *Hardy* v. *Baran*, 11 Mass. App. Ct. 82, 85 (1980). Compare *Hennessey* v. *Cities Serv. Ref. Co.*,

282 Mass. 487, 489-490 (1933); *Stoneham* v. *Fox Film Corp.*, 295 Mass. 419, 424-425 (1936); *Hurley* v. *Ornsteen*, 311 Mass. 477, 481-482 (1942); *Lucey* v. *Hero Intl. Corp.*, 361 Mass. 569, 572 (1972).

In the instant case there was evidence of the following variety of circumstances: Brown's title of *executive* vice-president; the location of his office opposite the president; his frequent communications with the president; the long course of dealing and negotiations; the encouragement of Kanavos by the president to deal with Brown; the earlier amendment of the agreement by Brown on behalf of the Bank on material points, namely the price to be paid by the Bank for the shares and the repurchase price; the size of the Bank (fourteen or fifteen branches in addition to the main office); the secondary, rather than fundamental, nature of the change in the terms of the agreement now repudiated by the Bank, measured against the context of the over-all transaction; and Brown's broad operating authority over the Executive House — all these added together would support a finding of apparent authority. When a corporate officer, as here, is allowed to exercise general executive responsibilities, the "public expectation is that the corporation should be bound to engagements made on its behalf by those who presume to have, and convincingly appear to have, the power to agree." Kempin, The Corporate Officer and the Law of Agency, 44 Va. L. Rev. 1273, 1280 (1958). This principle does not apply, of course, where in the business context, the requirement of specific authority is presumed, e.g., the sale of a major asset by a corporation or a transaction which by its nature commits the corporation to an obligation outside the scope of its usual activity. See *Bloomberg* v. *Greylock Bdcst. Co.*, 342 Mass. 542, 548 (1961). The modification agreement signed by Brown and dated July 16, 1976, should have been admitted in evidence, and a verdict should not have been directed.

*Judgment reversed.*