BOSTON ATHLETIC ASSOCIATION *vs.* INTERNATIONAL
MARATHONS, INC., & others.[1]

Suffolk.    March 8, 1984. — July 3, 1984.

Present: HENNESSEY, C.J., WILKINS, ABRAMS, NOLAN, & LYNCH, JJ.

*Injunction. Contract,* Validity. *Corporation,* Charitable corporation, Officers and agents, Ultra vires. *Agency,* Scope of authority. *Charity.*

A judge did not abuse his discretion in enjoining a defendant in a civil action from dispersing funds generated by a certain contract between that defendant and the plaintiff until the merits of the plaintiff's claims challenging the validity of the contract could be decided, where the materials before him, when considered in light of the plaintiff's likelihood of success on the merits, demonstrated that denial of the injunction would create a substantial risk of harm to the plaintiff far outweighing any risk of harm to the defendant from granting it. [362-363]

The board of governors of the Boston Athletic Association, a charitable corporation, had no power to delegate to the association's president the authority to enter into a sponsorship contract which would designate another corporation as the exclusive promoter of the Boston Marathon road race, where the purported delegation was so broad as to enable the president to commit the association to a contract which would substantially encumber the association's most significant purpose, the presentation of the Boston Marathon, and which would divert to private benefit the association's substantial earning capacity. [363-367]

A vote of the board of governors of the Boston Athletic Association, a charitable corporation, authorizing its president to negotiate and to execute agreements for the sponsorship of the Boston Marathon road race did not confer upon the president the apparent authority to enter into an agreement which had the effect of encumbering the principal function

---

[1] The other defendants in these cases are Marshall Medoff, the sole incorporator, officer, director, and shareholder of International Marathons, Inc.; Fidelity Daily Income Trust (FDIT), which maintains a money market fund in which some of the funds in dispute have been invested; Shawmut Bank of Boston, N.A., which acts as a custodian of the assets of FDIT; and the Attorney General of the Commonwealth, who is charged with the supervision and regulation of funds given to public charities within the Commonwealth. The Attorney General was joined as a party pursuant to G. L. c. 12, § 8G.

of the association and diverting to private benefit its substantial earning capacity. [367]

Although affirming a partial summary judgment which declared a contract between the plaintiff Boston Athletic Association and the defendant corporation, purporting to designate the defendant as the exclusive promoter of the Boston Marathon road race, to be void and unenforceable, this court remanded the case for a determination of the fair value of the promotional services rendered by the defendant, which it was entitled to recover from the plaintiff. [367-368]

CIVIL ACTION commenced in the Superior Court Department on September 27, 1982.

A motion for a preliminary injunction was heard by *Garrity, J.,* and a motion for partial summary judgment was heard by *Steadman, J.*

With respect to the order granting a preliminary injunction, the Supreme Judicial Court ordered direct appellate review on its own initiative. With respect to the partial summary judgment, the Supreme Judicial Court granted a request for direct appellate review.

*Edward J. Barshak (Jeffrey S. Stern & Tina M. Traficanti* with him) for International Marathons, Inc., & others.

*George C. Caner, Jr. (Thomas H. Hannigan, Jr.,* with him) for the plaintiff.

*Catharine W. Hantzis,* Assistant Attorney General *(Leslie G. Espinoza,* Assistant Attorney General, with her) for the Attorney General.

LYNCH, J. These two appeals present the question whether the president of the Boston Athletic Association (BAA), William T. Cloney, was authorized to enter into a certain contract with the defendant International Marathons, Inc. (IMI), by its president Marshall Medoff. This contract purported to designate IMI as the exclusive promoter of the Boston Marathon (Marathon).

Two rulings are before us: an interlocutory order granting the BAA's request for a preliminary injunction, and a partial summary judgment in favor of BAA declaring the contract be-

tween the BAA and IMI void ab initio.[2] We affirm both the interlocutory order and the partial summary judgment.

In granting the BAA's motion for partial summary judgment, the judge found the following facts. The BAA is a nonprofit corporation incorporated by c. 287 of the Acts of 1887, and under c. 180 of the General Laws.[3] The principal activity of the BAA is the presentation of an annual road race, the Boston Marathon. IMI is a Massachusetts business corporation organized on May 1, 1981, and headed by Medoff. Its purpose is to carry on the business of sales and sports promotions.

Discussion between Cloney and Medoff began in late 1980 about the possibility of commercial promotion of the Marathon by a corporation that Medoff would organize. In March, 1981, Cloney, who was president and a member of the board of governors of the BAA (board), and Medoff met with two other members of the board. A proposal prepared by Medoff for his becoming a promoter of the Marathon was discussed, but several objections were raised and no agreement was reached. The term of this proposed agreement was for a minimum of five years and a maximum of twenty years.

On April 27, 1981, a meeting of the board was held after due notice. There was general agreement at the meeting that a sharp increase in sponsorship revenues was needed to sustain the prestige of the race. A motion was presented to grant to Cloney authority to negotiate and execute agreements for the presentation and underwriting of the Marathon. Some of the

---

[2] Both appeals were originally filed in the Appeals Court. This court granted the petition for direct appellate review of the partial summary judgment, took the review of the preliminary injunction on its own motion, and consolidated the two appeals for the purpose of argument.

[3] Chapter 287 of the Acts of 1887 provides that the purposes of the BAA are those of "maintaining a club-house for social purposes and for the encouragement of athletic exercises, and maintaining a reading room." The BAA was dissolved in 1972 for failure to file annual reports, and was revived pursuant to G. L. c. 180, § 10A, by petition approved on June 23, 1978. The purposes of the association were amended in 1982 to include the encouragement of sports and the promotion of physical exercise "with particular emphasis on the sponsorship of long distance running events (especially the traditional annual Boston Athletic Association Marathon) and of track and field teams and meets."

members expressed concern about the breadth of the authori-
zation and possible implications as to the future conduct of the
Marathon. After expressions of confidence in Cloney's judg-
ment and discretion in the exercise of such a broad authoriza-
tion, the following proposal was approved by the board: "That
William T. Cloney, as President of the Association, be and
hereby is authorized and directed to negotiate and to execute
in the name of and in behalf of this Association such agreements
as he deems in the best interest of the Association for the
perpetuation, sponsorship or underwriting of the Boston A.A.
Marathon."

There was no mention at this meeting of the possibility of
hiring an exclusive promoter to whom major responsibility for
sponsorship of the Marathon would be delegated. In the past,
all sponsorship and broadcast coverage contracts had been
negotiated between Cloney and the individual sponsor. None
of the prior contracts had resulted in annual revenues to the
BAA in excess of $25,000. At no time in the past had the
BAA engaged an independent promoter for the Marathon.

After the April 27 meeting, and without the knowledge of
the other members of the board, Cloney continued to negotiate
with Medoff toward an agreement that would designate Medoff
as the exclusive promoter of the Marathon. Cloney informed
Medoff of the specific language of the April 27 vote. On
September 23, 1981, the agreement now in dispute was exe-
cuted by Cloney on behalf of the BAA and by Medoff on
behalf of IMI. Cloney and Medoff subsequently executed an
amendment to that agreement on January 13, 1982.

The agreement designates IMI as the exclusive promoter of
the Marathon. IMI can make five "major" and five "minor"
sponsorship contracts as well as agreements with an unlimited
number of companies which would supply services to the BAA.
The contract gives IMI the right to represent that the Marathon
is "presented by" IMI or its assignee. With the exception of
the Japanese market, all radio, television, and movie rights in
the Marathon are assigned to IMI.

The exclusive promoter arrangement is accomplished through
the transfer by the BAA to IMI of "all right, title and interest

to the exclusive use of the Boston Marathon and BAA Marathon logo(s)" and name, reserving to the BAA the right to use the name and logos only in so far as such use is "not inconsistent with" the agreement.

The agreement also governs the conduct of the parties in carrying out their contractual responsibilities. The agreement requires the BAA to "execute sponsorship agreements consistent with the terms and conditions stated herein, when IMI presents a sponsor ready, willing and able to execute and carry out the obligations of a sponsorship agreement." The BAA is bound to "cooperate fully with IMI's efforts to negotiate with sponsors" and is required to "do all things reasonably necessary as may be requested by IMI to effectuate consummation of agreements with the sponsors." The BAA reserves the right to decline to accept "any or all sponsors," but "approval of a sponsor shall not be unreasonably withheld." Certain sponsors, however, are approved by the amendment to the contract and, as to these sponsors, IMI itself "may execute on behalf of the BAA the sponsorship agreement, if the form of the sponsorship agreement is consistent with a form approved by prior BAA use." The BAA is solely responsible for the actual production and the expenses of the Marathon and "shall lend its cooperation and support to IMI and the sponsors to make the event successful." The agreement further provides that the BAA will not make any independent sponsorship arrangements "without the written consent of IMI."

According to the financial terms of the agreement, the "annual sponsorship fee" due the BAA is $400,000.[4] All sponsorship revenues in excess of $400,000 are payable directly to IMI. The BAA can agree to accept less than $400,000 in a particular year if sponsorship agreements for that year total less than that amount. Every five years the sponsorship fee shall be increased by an amount equal to the average change of the Consumer Price Index for the preceding five-year term.

---

[4] If the Marathon is produced on a Sunday (rather than the traditional Monday, Patriots' Day), and can be televised by a national commercial network, the fee becomes $600,000.

The agreement does not require that the annual fee be paid to the BAA from revenues actually received from a sponsor.

The agreement has the following renewal provision: It "shall extend and renew itself automatically and shall continue year to year so long as the annual sponsorship fee . . . is paid."

Pursuant to this agreement, in the ensuing months Medoff negotiated and Cloney executed sponsorship contracts on behalf of the BAA. The existence of these contracts was not brought to the attention of the board. The sponsors that IMI secured paid their fees directly to IMI. A majority of the members of the board did not learn of the existence of the disputed agreement until late February, 1982. The board, by a vote taken on September 9, 1982, declared the agreement of September 23, 1981, to be beyond the authorization vested in Cloney by the board's vote of April 27, 1981.[5]

On September 9, 1982, the director of the division of public charities in the Department of the Attorney General examined the agreement between IMI and the BAA, pursuant to G. L. c. 68, § 21, and determined that the compensation paid to IMI under the agreement was likely to exceed fifteen percent of the total moneys, pledges, or other property raised or received as a result of the contract. As a result, the director disapproved the contract.[6]

On September 27, 1982, the BAA commenced an action seeking a preliminary injunction and to have the agreement set aside. Two of its arguments were that the contract had been disapproved as violative of G. L. c. 68, § 21, and that its terms and conditions exceeded the authority delegated to Cloney.

---

[5] The record indicates that on July 16, 1982, IMI tendered to BAA a check in the amount of $400,000 upon the condition that indorsement of the check would acknowledge that it was "[i]n full payment of the obligations for 1982 of International Marathons, Inc. under Agreement of September 23, 1981, as amended, which Agreement is ratified and confirmed by acceptance hereof." The BAA returned the check to IMI stating that the condition thus imposed was unacceptable.

[6] IMI challenged this disapproval and a hearing was held before the division of public charities. The decision of the hearing examiner, which affirmed the director's disapproval of the contract, was appealed by IMI. *International Marathons* v. *Attorney Gen., post* 376 (1984).

On September 29, 1982, a Superior Court judge preliminarily enjoined IMI from using or in any way alienating any of the funds received from sponsors of the Marathon. On August 29, 1983, a second judge of the Superior Court granted the BAA's motion for a partial summary judgment declaring the agreement of September 23, 1981, void and unenforceable.

1. *The preliminary injunction.* The judge did not abuse his discretion in granting the BAA's request for preliminary relief.[7] He made a reasonable assessment of the risk of irreparable harm to either party as a result of the issuance or denial of the injunction and the likelihood of the moving party's success on the merits. *Packaging Indus. Group, Inc.* v. *Cheney,* 380 Mass. 609, 617 (1980). The BAA's complaint challenged the validity of its contract with IMI. As a result, it sought an injunction to prevent the dispersal of the funds generated by that contract until the merits of its claims could be decided. The harm to the BAA if the injunction were denied was the risk that IMI would dispose of the funds prior to a determination on the merits. The harm to IMI if the injunction were granted was loss of use of the money pending that determination. The risk to the BAA is far greater than the risk to IMI. If IMI were ultimately to prevail on the merits, it could be compensated for loss of use of the funds by assessment of an interest payment. However, if the injunction were denied, if the BAA were to prevail, and if the money were spent by IMI, the BAA would be put to the time-consuming and sometimes difficult task of trying to exact its damages. Furthermore, the judge determined that there was a "reasonable probability" of success on the merits. He based this conclusion on the fact that the Attorney General's division of public charities had characterized the contract as subject to the provisions of G. L. c. 68, § 21. While we do not express an opinion as to whether the action of the Attorney General is entitled to "presumptive validity," we do agree that, on balance, the BAA demonstrated sufficient

---

[7] In reviewing an interlocutory order granting injunctive relief we must "focus on the same factors" as the judge in the Superior Court and "determine whether the judge applied the proper legal standard in granting . . . the requested relief." *Commonwealth* v. *Mass. CRINC, ante* 79, 87 (1984).

likelihood of success and sufficient risk of harm to be entitled to a preliminary injunction which did no more than preserve the status quo.

2. *The validity of the contract.* For the reasons developed below, we hold the contract between the BAA and IMI to be void and unenforceable. The defendant is, however, entitled to recovery in quantum meruit for the services it rendered in obtaining sponsorship contracts for the running of the Marathon in 1982.

a. *Improper delegation of authority.* Whether the board intended by its vote of April 27, 1981, to confer upon Cloney the authority to enter into the sponsorship agreement with IMI, that contract is void. The board of directors of a corporation cannot delegate total control of the corporation to an individual officer. *Stoneman* v. *Fox Film Corp.,* 295 Mass. 419, 425 (1936). See 2 W. Fletcher, Cyclopedia of Private Corporations § 496, at 504 (rev. perm. ed. 1982). Neither can it delegate authority which is so broad that it enables the officer to bind the corporation to extraordinary commitments or significantly to encumber the principal asset or function of the corporation. *Bloomberg* v. *Greylock Broadcasting Co.,* 342 Mass. 542, 548 (1961).

The contract seriously encumbers the manner in which the BAA may conduct the Marathon. The BAA is obliged to produce the race in its traditional form and to pay the entire bill. But it is not entitled to "present" the race. That right, as well as the right to use the name and logo of the BAA, belongs to IMI or its assignee. The BAA may not use its own logo in any way "inconsistent" with IMI's rights pursuant to the contract. The right to enter into sponsorship agreements belongs exclusively to IMI, although the BAA can reasonably withhold its approval.[8] The BAA may not make independent agreements without written permission from IMI. Finally, the contract between IMI and the BAA is automatically renewable at the

---

[8] The natural interpretation of a reasonable objection is one based on a conclusion that a sponsor's product is inconsistent with the principles espoused by the BAA, for instance, alcohol or cigarettes.

option of IMI. Under the plain language of the agreement, there is no way for the BAA to end the relationship.[9]

In return for carrying out its obligations under the contract, the BAA is to be paid a $400,000 fee. Any revenues in excess of $400,000 are directly payable to IMI, and there is no limit to the number of sponsors who may be solicited or to the amount of money which may be raised.[10] The annual fee is to be paid prior to the actual running of the race, but if the Marathon should not be run for some reason, the fee is to be returned to IMI.

According to the traditional principles of corporate governance, the board of governors of the BAA does not have the power to delegate to an individual officer authority to enter into a contract which so totally encumbers the most significant purpose of the BAA, the presentation of the Marathon. The by-laws of the BAA indicate that its organization and operation are, in all material respects, the same as those of a Massachusetts business corporation.[11] Principles of corporate governance with respect to the power of the board of governors to delegate authority to individual officers are applicable to profit and nonprofit corporations alike. *Massachusets Charitable Mechanic Ass'n* v. *Beede,* 320 Mass. 601, 609-610 (1947). In fact, the powers of an officer of a charitable corpo-

---

[9] IMI suggests that the BAA could exercise its option to decline all sponsors on the reasonable basis that it had "decided to change its policy and not have sponsors" at all. This interpretation leaves the BAA in the unreasonable position of having to choose between sponsorship through IMI or no sponsorship at all.

[10] Although the original agreement provided for a maximum of five "major" sponsors and five "minor" sponsors with on-site recognition (the number of minor sponsors without on-site recognition is unlimited), the January 13, 1982, amendment to the contract did away with these restrictions.

[11] Section 4.2 of the by-laws provides that the property and affairs of the association be managed by a board of governors. Section 12 provides that all contracts "shall be authorized by the board of governors." These provisions are consistent with the general principle expressed in G. L. c. 156B, § 47, as appearing in St. 1974, c. 350, § 1, that "[e]xcept as reserved to the stockholders . . . the business of every corporation shall be managed by a board of directors."

ration to bind the corporation without specific ratification by the board of governors or directors are more strictly construed than would be similar powers of an officer of a business corporation. *Boston Y.M.C.A.* v. *Royal Indem. Co.,* 289 Mass. 391, 395 (1935). The validity of the board's purported delegation of authority to Cloney must be analyzed in this context.

Corporate officers are generally empowered, by delegation of authority of the board of directors, with general managerial functions. They are responsible for the day to day operation of the corporation. *Lydia E. Pinkham Medicine Co.* v. *Gove,* 298 Mass. 53, 63 (1937). See 2 W. Fletcher, Cyclopedia of Private Corporations § 495, at 499 (rev. perm. ed. 1982). Courts are usually flexible and accommodating in allowing boards to delegate authority as necessary or expedient. *Id.* But certain powers cannot be delegated generally. Certain transactions require specific authorization by the board in order to be valid. For example, in *Stoneman* v. *Fox Film Corp.,* 295 Mass. 419 (1936), the court found that the president, although authorized to act as a general manager on behalf of a film company, was not authorized to commit the company to the purchase of a theatre, an extraordinary transaction which involved a large financial commitment. The court indicated that delegation of authority to conduct such business was a "course of conduct manifestly . . . unusual and extraordinary in the management of a corporation." It was an abdication of "the entire control" of the corporation and "[t]he functions of directors may not be abdicated." *Id.* at 425.

In *Kanavos* v. *Hancock Bank & Trust Co.,* 14 Mass. App. Ct. 326 (1982), a bank officer was found to have authority to bind the bank with respect to certain loans. The court noted that this principle would not apply where "the requirement of specific authority is presumed, e.g., the sale of a major asset by a corporation or a transaction which by its nature commits the corporation to an obligation outside the scope of its usual activity." *Id.* at 333. Similarly, in *Bloomberg* v. *Greylock Broadcasting Co.,* 342 Mass. 542, 548 (1961), the president and general manager of a broadcasting corporation did not

have authority to sell a television station, "a substantial part of its assets, needed for the conduct of its business."

The power of officers to bind charitable corporations is even more narrowly construed. In *Peoples Nat'l Bank* v. *New England Home for Deaf Mutes, Aged, Blind & Infirm,* 209 Mass. 48 (1911), for example, the court held that the president and the treasurer of a charitable corporation did not have the power, absent special authorization, to bind the organization on a promissory note. The rule on delegation of authority to officers of charitable or nonprofit organizations is the result of heightened public interest in the affairs of those organizations. Those entrusted with the management of funds dedicated to charitable purposes and donated out of a sense of social or moral responsibility owe an especially high degree of accountability to the individual donors as well as to the community.[12]

In light of these principles, it is clear that if the delegation to Cloney was so broad as to enable him to commit the BAA to an extraordinary contract which encumbered substantially all its assets, the board would have delegated away control of the very essence of the BAA's corporate existence. Cf. *Massachusetts Charitable Mechanic Ass'n* v. *Beede,* 320 Mass. 601, 611 (1947) ("any action of the corporation, at least in the absence of statutory authority, whereby it attempted to divest itself of a large part of its assets . . . must be deemed beyond its powers and ineffectual"). It is the obligation of the board of governors to oversee the presentation of the Marathon, not to surrender virtually complete control of the event to another organization. The fact that the agreement is automatically renewable and thus potentially perpetual demonstrates the pervasive nature of the limitation on the main purpose of the BAA. Authority to make such a contract was beyond the power of the

---

[12] In another case decided today, *Attorney General* v. *International Marathons, Inc., post* 370 (1984), we hold that the sponsorship fees paid to IMI on behalf of the BAA are not charitable contributions within the meaning of G. L. c. 68, §§ 18, 21, and 23. That holding has no effect on our decision here, which concerns the power of the board to delegate broad authority to an individual officer. The heightened scrutiny of the management of nonprofit corporations does not turn on whether the objectionable activity involves the solicitation of charitable contributions.

board to delegate to Cloney. See *Bloomberg* v. *Greylock Broadcasting Co., supra.* See also *Stoneman* v. *Fox Film Corp.,* 295 Mass. 419 (1936).

Furthermore, the contract between IMI and the BAA is especially vulnerable because it is antithetical to the BAA's nature as a nonprofit corporation inasmuch as this agreement turns the solicitation of sponsors from a way to support the Marathon to a way for IMI to make a profit. It is entirely inconsistent with the nonprofit nature of the organization to permit such a substantial segment of the revenue earning capacity of the Marathon to be used as a vehicle for personal gain. See *Milton Frank Allen Publications, Inc.* v. *Georgia Ass'n of Petroleum Retailers, Inc.,* 224 Ga. 518, 526-528 (1968) (contract by which directors of a charitable corporation delegated away control over membership and dues, "both of which are absolutely necessary for the existence of the Association and for its success in carrying out its purposes," and which divested the association of the greater portion of its income for the pecuniary benefit of a private party, was seen as offensive to public policy).

For the foregoing reasons, the board of governors of the BAA was not empowered to delegate to Cloney the right to make this contract with IMI.

b. *Apparent authority.* IMI argues that the April 27, 1981, vote of the board conferred upon Cloney the apparent authority to enter into the disputed agreement. This argument is not persuasive. "Persons dealing with a corporation are presumed to know the extent of its powers." *Wiley & Foss, Inc.* v. *Saxony Theatres, Inc.,* 335 Mass. 257, 260-261 (1957). An officer of a nonprofit corporation cannot have apparent authority to encumber the principal function of the corporation and to divert the substantial earning capacity of the corporation to private benefit. *Kanavos* v. *Hancock Bank & Trust Co.,* 14 Mass. App. Ct. 326, 333 (1982) (the doctrine of apparent authority does not apply when, in the case of an unusual transaction, "the requirement of specific authority is presumed").

3. *Quantum meruit.* Although the promotion contract between IMI and the BAA is unenforceable, nevertheless as the

BAA concedes IMI is entitled to recover the fair value of its services. *Guenard* v. *Burke,* 387 Mass. 802, 808 (1982). See *Hudson City Contracting Co.* v. *Jersey City Incinerator Auth.,* 17 N.J. 297 (1955) (although contract between city and garbage collector was ultra vires, collector was entitled to a quantum meruit recovery). IMI unquestionably performed services of value to the BAA by soliciting a number of sponsors, and it would be unjust if the BAA were to receive the benefit of those revenues free of charge. However, "[t]he question of what [is] fair and reasonable compensation for the services rendered is a question of fact." *Guenard* v. *Burke, supra* at 808. We venture no opinion as to the reasonable value of IMI's services. It is a question for the fact finder to decide.

There are numerous factors for the fact finder to consider in making this assessment. Cf. *Cummings* v. *National Shawmut Bank,* 284 Mass. 563, 569 (1933) (In determining fair value of services rendered by attorney, factors for jury to consider include "the ability and reputation of the attorney, the demand for his services by others, the amount and importance of the matter involved, the time spent, the prices usually charged for similar services by other attorneys in the same neighborhood, the amount of money or the value of the property affected by controversy, and the results secured"). In terms of assessing IMI's recovery, the fact that the BAA is a nonprofit organization may or may not distinguish this case from one involving an ordinary service contract between two commercial businesses.[13] It is up to the fact finder to decide how or whether that should affect IMI's recovery.

The interlocutory order granting BAA's motion for a preliminary injunction is affirmed. The partial summary judgment declaring the agreement of September 23, 1981, to be void and

---

[13] We do not today decide the constitutionality of G. L. c. 68, § 21, the statute which limits a professional solicitor's commission to fifteen percent of the total amount raised as a result of that solicitation. It should be noted, however, that the parties themselves set the commission at fifteen percent if total revenues were less than $400,000.

unenforceable is also affirmed. The case is remanded to the Superior Court for a determination of the fair value of the services rendered by International Marathons, Inc.

*So ordered.*