CONTEL CREDIT CORPORATION *vs.* CENTRAL CHEVROLET,
INC.

No. 89-P-328.

Hampden. March 5, 1990. - July 30, 1990.

Present: ARMSTRONG, PERRETTA, & SMITH, JJ.

*Corporation*, Officers and agents. *Agency*, Scope of authority or employ-
ment. *Guaranty*.

The recipient of a corporation's guaranty of another's obligation to make
payments pursuant to a lease was entitled to rely on a certificate of the
secretary of the corporation that its board of directors had authorized
the execution and delivery of the guaranty in circumstances where
there was no evidence that the recipient knew or should have known
that the secretary's certificate had been fraudulently procured. [86-87].

CIVIL ACTION commenced in the Superior Court Depart-
ment on March 27, 1986.

The case was heard by *Andrew G. Meyer*, J.

*Alice E. Zaft* for the plaintiff.

*Richard F. Faille* for the defendant.

PERRETTA, J. Contel Credit Corporation (Contel) financed
the lease of a telephone system to Hallman Chevrolet, Inc.
(Hallman). Payment of the lease was guaranteed by Central
Chevrolet, Inc. (Central). Central's guaranty was signed by
one Joseph Pugia, who claimed to be Central's vice president
and chief operations officer. The guaranty was supported by
a certificate of the secretary of Central, certifying that Cen-
tral's board of directors had authorized Pugia to execute and
deliver the guaranty on Hallman's debt. Hallman went bank-
rupt, and Contel brought this action against Central to re-
cover on the guaranty. The judge found that Pugia was
neither an officer nor director of either Hallman or Central
and that Pugia had obtained the certificate of the secretary
by trickery. He concluded that Contel should have verified

Pugia's representations, and dismissed the complaint. On Contel's appeal, we conclude that, on the facts found by the judge, there was no basis for denying Contel the right to rely upon the certificate of the secretary of Central. We reverse the judgment.

I. *The Facts.*

We relate the facts found by the judge as they are warranted by the evidence. Maynard Hallman was the original owner of both Central and Hallman. Central did business in West Springfield, and Hallman was located in Salem. Maynard Hallman's son was in charge of the Salem dealership. Floyd Volk was the president of Central, and, since 1981, its sole stockholder. Pugia worked for Central as a general manager from November 1, 1981, until December 31, 1982.

With these facts as background, we turn to the spring of 1982. By that time, it had become apparent that Maynard Hallman's son should not have been put in charge of Hallman. As described by the judge, the Salem dealership was in a "mess." The son was removed. In the late spring of 1982, Volk and Pugia travelled to Salem to try to correct the problems at Hallman which the son had caused. During that time, Volk entertained thoughts about buying the Salem dealership from Maynard Hallman. He could not do so, however, because of his interest in the West Springfield dealership, Central.[1] Pugia then decided to purchase the Salem agency. Volk had no objection to his general manager's leaving Central and buying Hallman, as the two businesses were noncompeting. Indeed, Volk assisted Pugia. He wrote to the "Chevrolet Zone Office" on November 9, 1982, and gave his "permission for . . . [his] General Manager/Vice President," Pugia, to become the dealer principal of Hallman.

It was no later than September that Volk made his last business trip to Salem. Pugia, however, since deciding to buy Hallman, had been travelling to Salem with greater frequency for some months. In August, without Volk's knowl-

---

[1]The Chevrolet Motor Division of General Motors Corporation would not allow him to be a principal dealer in more than one location in Massachusetts.

edge, Pugia obtained from Contel a corporate guaranty form which he signed, describing himself as Central's "V.P.C.O.O." (vice president chief operations officer). Next, he "persuaded" the secretary and treasurer of Central to sign the "Certificate of the Secretary on the reverse side of the form, assuring her that she was signing as a witness." The form which Pugia gave to her, however, was blank. She testified that Pugia wanted her "to witness his signature but there was no signature on it."

There is no need to speculate as to whom the judge believed or why: "I find it difficult to believe that an experienced business woman [the secretary] would do such a stupid thing but having observed Pugia as a witness, I find him completely without scruple and undoubtedly a persuasive con man. In effect, he tricked . . . [the secretary] into signing the Certificate of the Secretary certifying to corporate resolutions which had never been presented to or voted on by the Central Chevrolet directors." In addition to this deception, the judge found (based upon the inference that he drew from the face of the guaranty) that Pugia "secretly, without telling anyone and certainly without authorization, obtained a corporate stamp and placed the corporate seal in three places on the Corporate Guaranty."

Recovery on the guaranty was denied Contel because the judge found that Contel "never checked Pugia's credentials" with Volk and that although there was, "at one time," common ownership of Central and Hallman, they were separate and distinct corporations. Contel "was completely unjustified in assuming there was any legitimate basis" for Central to guarantee Hallman's debt, and it had an "obligation to verify in some way the statements of Pugia." For these reasons, the judge concluded that Central was not "estopped from denying an obligation under the fraudulent and spurious" corporate guaranty. On the facts found, this conclusion is erroneous.

II. *Discussion.*

Unless disallowed by self-imposed restrictions, a corporation is authorized "to . . . give guarantees." G. L. c. 156B, § 9(*h*), inserted by St. 1964, c. 723, § 1.[2] Notwithstanding this statutory authorization and even if Pugia had been the vice president of Central, a corporate guaranty of the debt of an unrelated corporation is not a routine business decision within the delegable managerial functions of a corporate officer. See *Kelly* v. *Citizens Fin. Co.*, 306 Mass. 531, 532-533 (1940); *Boston Athletic Assn.* v. *International Marathons, Inc.*, 392 Mass. 356, 365 (1984); *Kanavos* v. *Hancock Bank & Trust Co.*, 14 Mass. App. Ct. 326, 332 (1982). As stated in *Williams* v. *Dugan*, 217 Mass. 526, 527 (1914); "The power to borrow money or to execute and deliver promissory notes is one of the most important which a principal can confer upon an agent. It is fraught with great possibilities of financial calamity. It is not lightly to be implied. It either must be granted by express terms or flow as a necessary and inevitable consequence from the nature of the agency actually created."

Contel's argument is not based upon a claim that Central cloaked Pugia with the apparent authority to give its guaranty for Hallman's debt. See *Kanavos* v. *Hancock Bank & Trust Co.*, 14 Mass. App. Ct. at 333, noting that the doctrine of apparent authority "does not apply, of course, where in the business context, the requirement of specific authority is presumed." Rather, it is Contel's position that the certificate of the secretary provided it with the requisite verification, that is, Central's granting of specific or express authority to Pugia to execute and deliver its corporate guaranty. See *Federal Natl. Bank* v. *Shoolman*, 276 Mass. 191, 192-193 (1931); *Rubel* v. *Hayden, Harding & Buchanan, Inc.*, 15 Mass. App. Ct. 252, 254 (1983).

---

[2]The corporate guaranty here in dispute was given in 1982. Section 9(*h*) should now be read with G. L. c. 156B, § 9B, inserted by St. 1986, c. 152, § 1, which imposes certain conditions upon the making of corporate guaranties.

There is record support for all the judge's findings concerning Pugia's trickery and deceit in respect to Central and Hallman. But there is nothing in the record to show that Contel knew or should have known of Pugia's dishonesty, and, therefore, there was no basis for denying Contel the right to rely upon the certificate of the secretary certifying to Pugia's express authority to bind Central as Hallman's guarantor. See *Commonwealth* v. *Reading Sav. Bank*, 137 Mass. 431, 440-441 (1884); *Widett* v. *Pilgrim Trust Co.*, 336 Mass. 738, 742-743 (1958). Cf. *Dolan* v. *Airpark, Inc. (No. 1)*, 24 Mass. App. Ct. 714, 716 (1987).

III. *Conclusion.*

It follows from what we have said that the judgment is reversed. As Central's liability on the guarantee has been established, the matter is remanded to the Superior Court for further proceedings on the sole issue of damages.

*So ordered.*