Van Gestel, J.
This matter is before the Court on the motion for summary judgment of the defendant Jeffrey S. Troderman (“Troderman”).[1] In the motion, Troderman seeks summary judgment as to all claims against him by the plaintiff,[2] Jane Osborne McKnight (“McKnight”), Trustee of the Trust of Harry J. Osborne (the “Trust”), and seeks summary judgment on his cross claims against defendants Paul D. Osborne (“Osborne”),[3] Paul J. Tesorero (“Tesorero”), and Paul D. Osborne Desk Co., Inc. (the “Company”).
BACKGROUND
The underlying action, for the most part, involves a struggle between McKnight, in her capacity as Trustee of the Harry J. Osborne Trust, against her brother Osborne, and Tesorero over certain actions regarding the corporation known as Paul D. Osborne Desk Company, Inc. The Trust, of which McKnight is trustee, owns 50% of the common stock of the Company. Tesorero owns the other 50% of the Company’s stock. Tesorero is president of the Company and Osborne, who owns no stock therein, is its treasurer. Osborne and McKnight are brother and sister, each being among the children of Harry J. Osborne.
The Company was founded by Paul D. Osborne, and operated for many years by his son Hariy J. Osborne and Ted Tesorero, Tesorero’s father. As too often happens, the generations that follow the founders and *19 those who built up a closely held corporation are fighting over the corporate remains. There is a history of prior litigation concerning control of the Company.[4]
Troderman is a certified public accountant with an extensive history and experience in working with distressed businesses. For reasons not of Troderman’s making — indeed, he never even heard of the Company before January of2000 — the Company was in strained financial condition when he was asked, on January 4, 2000, to serve as the Trust Mortgagee for a Trust Indenture and Security Agreement (hereafter referred to as the “Trust Mortgage”) contemplated by the Company for the purposes of winding down its affairs in an orderly manner. On January 5, 2000, Troderman agreed to accept the position and signed the Trust Mortgage.
The.Trust Mortgage was executed for the Company by Tesorero, as president, Osborne, as treasurer, and by Troderman as Trust Mortgagee. At the time of the execution of the Trust Mortgage, Osborne and Tesorero appear to have been the Company’s only officers and its only directors.[5]
Among many other things, the Trust Mortgage provides:
1-3 DEBTOR. As used herein, the word “DEBTOR” shall refer to PAUL D. OSBORNE DESK CO., INC. a Massachusetts corporation with its principal place of business at Summer Street, Boston, Massachusetts.
3-1 To secure the obligations of the DEBTOR hereunder, including without limitation, the DEBTOR’S obligation to consummate the arrangement established herein, and to secure the DEBTOR’S payment of the abovementioned Obligation, the DEBTOR grants to the TRUST MORTGAGEE a continuing security interest and/or lien in and to all described property of the DEBTOR and in any and all proceeds thereof of any type or nature (which property is collectively referred to as the “Collateral”) as may be more fully described without limitation as follows: [thereafter the assets are listed, including accounts receivable, contract rights, chattel paper, general intangibles, actions and causes of action, choses in action, inventory, furniture and equipment, etc.].
4-10 . . . The DEBTOR agrees to indemnify and defend the TRUST MORTGAGEE and hold the TRUST MORTGAGEE harmless in respect to any claim or proceeding arising out of any matter referred to in this Section.
5-1 The TRUST MORTGAGEE shall distribute to each CREDITOR such CREDITOR’S proportional share of the sums paid to the TRUST MORTGAGEE by the DEBTOR in satisfaction of its Obligations ...
By Section 6-5 the Trust Mortgagee is directed to “distribute the proceeds of any liquidation of the Collateral effected [t]hereunder in the following order of priority”: (1) all claims secured by valid and perfected security interests; (2) all costs and charges in connection with the administration of the Trust: (3) all wage claims; (4) taxes, debts and other claims; (5) pro rata and consenting creditors; (6) pro rata among non-consenting claimants; and (7) to the Debtor.
Article 9 states the purpose of the Trust Mortgage. It reads in its entirety:
This instrument in all its parts and provisions is executed for the benefit and protection of the DEBTOR’S CREDITORS whose interests shall be paramount at all times. All acts and deeds done hereunder shall be done with a view to the primary and paramount protection of the interest of such CREDITORS and all terms and provisions hereof shall be interpreted and construed so as to effectuate such primary and paramount interests of the CREDITORS.
Troderman was told by Osborne at the initial meeting in January that he, Osborne, would notify the rest of the Osborne family about the execution of the Trust Mortgage. Osborne failed to do so. Consequently, in a January 29, 2000 letter, Troderman’s attorney wrote and reported to McKnight. McKnight is a practicing attorney in Burlington, Vermont. Her response was immediate and evidenced her “shock! ] at the contents of [Troderman’s counsel’s] letter and the accompanying Trust Indenture.”
McKnight claims that no one had mentioned this transaction to her, formally or informally. She declined to assent to the Trust Mortgage on behalf of the 50% stockholder interest represented by the Trust and expressed her “formal and strenuous objection to the same.” From that point forward, McKnight and her counsel demanded that Troderman cease and desist from taking any action as Trust Mortgagee until the matter could be resolved and otherwise threatened litigation.
Troderman, to some extent, continued his activities in a limited way for a short time thereafter. Basically he was attempting to identify and gather assets of the Company, collect assent forms from creditors, endeavor to dislodge the Company from unfavorable leases that were months in arrears and generally take steps towards winding down the operation consistent with the directives of the Trust Mortgage.
On March 7, 2000, Troderman’s counsel confirmed that Troderman was continuing his activities under the assumption that McKnight had given permission to do so. On March 8, 2000, McKnight wrote to Tesorero as president of the Company and requested that Troderman continue to collect the accounts receivable and place them in an escrow account, with details to be worked out with her counsel. Apparently the escrow account was established and still exists.
There was no overall resolution with McKnight, however, and therefore Troderman, by letter dated *20 March 15, 2000, announced that he had resigned as Trust Mortgagee “effective on the close of business on Monday, March 13, 2000.” By Section 8-4 of the Trust Mortgage, Troderman had the right to so resign “by a written resignation delivered to the DEBTOR and all CREDITORS.”
It is in this context, the foregoing facts at least not being in dispute, that the Court addresses Troderman’s motion.
DISCUSSION
The Court begins, where it must, with an analysis of the Trust Mortgage. From the beginning, Troderman and McKnight disagree over its validity.
McKnight claims that the document is not really a standard mortgage but rather an instrument designed for the liquidation of the Company. As such, under G.L.c. 156B, Sec. 100, she argues that there is the need for a super-majority vote by two-thirds of the shareholders. All parties agree there was no such vote and all parties agree that liquidation of the Company was what was occurring. McKnight further contends that, in any event, the effect of the Trust Mortgage is a “sale, lease or exchange of all or substantially all of [the] property and assets [of the Company]” which, under G.L.c. 156B, Sec. 75(a) also requires a two-thirds vote of the shareholders. Again, all parties agree that there was no such vote.
Troderman looks to G.L.c. 156B, Sec. 54, that gives directors the authority to exercise “all powers of the corporation, except such as by law, by the articles of organization or by the by-laws of the corporation are conferred upon or reserved to the stockholders.” He also cites to G.L.c. 156B, Sec. 75(b). This latter section was added to a prior version of Sec. 75 in 1980 and further modified in 1981. See St. 1980, c. 494; St. 1981, c. 298, Sec 3. This amended Section 75(b) now reads in its entirety: .
(b) The authorization or consent of stockholders to the mortgage or pledge of, or granting of security interest in, property or assets of a corporation shall not be necessary except to the extent that the corporation’s articles of organization otherwise provide.
Nothing in the articles of organization of the Company provides for any stockholder authorization or consent to enter into a trust mortgage of the kind here in issue.
The Court first examines the statutory provisions applicable here. The Company is a for -profit entity and therefore governed statutorily by G.L.c. 156B. See Sec. 3 thereof. Chapter 156B is based upon the Model Business Corporations Law.
By Sec. 9(f) of c. 156B, the Company has the power “to sell, convey, lease, exchange, transfer, or otherwise dispose of, or mortgage, pledge, encumber or create a security interest in, all or any of its property, or any interest therein, wherever situated.”
By Sec. 54 of c. 156B, the “directors may exercise all the powers of the corporation, except such as by law, by the articles or organization or by the by-laws of the corporation are conferred upon or reserved to the stockholders.” Nothing in this case has been brought to the attention of the Court that, for the purposes here under consideration, the Company’s articles of organization or its by-laws confers or reserves to the stockholders the sole power to enter into a trust mortgage of the kind in issue here. Thus, the Court must continue its examination of c. 156B and any applicable case law.
In its present form, c. 156B, Sec. 75(a)[6] reads in material part as follows:
(a) Every corporation may . . . authorize, at a meeting duly called for the purpose, by vote of two-thirds of the shares of each class of stock outstanding and entitled to vote thereon, the sale, lease or exchange of all or substantially all of its property and assets
A voluntary dissolution of a Massachusetts for-profit corporation “may be authorized (1) by the vote of two thirds of each class of its stock outstanding and entitled to vote thereon; or (2) by compliance with the provisions of its articles of organization.” C. 156B, Sec. 100(a).
The Trust Mortgage here is similar in many respects to an assignment for the benefit of creditors under G.L.c. 203, Secs. 40-42. It has the aspects of a private bankruptcy designed for the voluntary and orderly dissolution of the Company. The question that it presents is whether it is a mortgage-type instrument governed by c. 156B, Sec. 75(b), or an instrument designed to accomplish a voluntary dissolution under c. 156B, Sec. 100.
Under the circumstances of this case, it does not seem to matter. The mortgage here is not the kind of security interest that corporations regularly grant to secure borrowings in the ordinary course of business. Given the presumed knowledge of the Legislature of the requirement for a two-thirds stockholder vote for a voluntary corporate dissolution under G.L.c. 156B, Sec. 100, when the 1980 and 1981 amendments were made to c. 156B, Sec. 75, it cannot be that the General Court intended an instrument of dissolution of a closely held corporation — like that in issue here, see, e.g., Donahue v. Rodd Electrotype, Co. of New England, Inc., 367 Mass. 578, 586-87 (1975)—was what it had in mind when it freed mortgages from the need for stockholder approval. This Court rules that even if the instrument is deemed a “mortgage” of some sort and may have validity for some purposes, it is also the instrument accomplishing liquidation and dissolution of a closely held corporation, and, given the fiduciary duties that flow between the stockholders, and the directors that the stockholders control, in such an entity, a two-thirds stockholders’ vote of approval must be required for any instrument, whatever it *21 purports to be, that causes a corporate dissolution or liquidation.
Assuming that the Trust Mortgage is invalid as an instrument to cause a dissolution for lack of appropriate corporate authority, what then becomes of the claims by McKnight against Troderman?
Under the circumstances that obtain as a result of this Court’s ruling that the Trust Mortgage is invalid without a two-thirds vote of the stockholders, it appears that Troderman must then be seen as either an employee or as an independent contractor, with an implied contract, engaged by the president and treasurer of the Company to perform a specific task. The Trust Mortgage, although invalid as a means of dissolving or liquidating the Company, can be used as the template to determine Troderman’s position. See, e.g., Salmon v. Terra, 394 Mass. 857, 859 (1985); Boston Athletic Ass’n v. International Marathons, Inc., 392 Mass. 356, 367-68 (1984).
To this Court, Troderman is found to be an independent contractor engaged for the benefit and protection of the Company’s creditors. He was not engaged for a salary and he received none of the usual benefits of an employee. He was not subject to the Company’s control in the performance of his work, only its ultimate outcome. See, e.g., Dykes v. DePuy, Inc., 140 F.3d 31 (1st Cir. 1998). All of the acts he was engaged to do were to be “with a view to the primary and paramount protection of the interests of such creditors.” Trust Mortgage, Article 9. His principal role was to get the Company’s creditors, who were pressing for payment of debt to them, to come to agreement as to the amount they would accept and to cause the Company to pay that debt. By the Trust Mortgage, if the Company did not make the payments he negotiated, then he had a security interest in the Company’s assets from which he could raise the necessary funds.
A corporation’s president or its treasurer certainly has the inherent authority to hire such an independent contractor for those purposes. While the president or the treasurer may not have had the authority to cause a dissolution without the requisite stockholder approval, that is the president’s and the treasurer’s issue to resolve, not that of the independent contractor they hired. Troderman, in this capacity, had no “duty” to the shareholders of the Company. His obligations were to perform under the agreement with the Company that defined the tasks for which he was engaged — and nothing in the record demonstrates that, for the brief period he was involved, he did other than that.
Further, the liquidation and dissolution of the Company was not caused or completed by Troderman. He resigned, just as his “contract” authorized him to do, at a time when he had not even finished identifying and collecting all of the accounts receivable, to say nothing of paying out those receivables to the creditors. The receivables he did collect are, apparently, in an escrow account precisely as McKnight requested.
Nor is Troderman shown to have ever exercised any foreclosure rights over any of the Company’s assets pursuant to the Trust Mortgage. Thus, he never had possession of those assets.
In short, Troderman caused the Company no damage, he breached no duties to the stockholders and he was not negligent in performing his tasks. He had every right to rely on Tesorero’s and Osborne’s authority to engage him. Thus Counts III and IV against him cannot stand.
Further, Count VI, charging him with conspiracy, must fail for a lack of showing that he had the requisite “peculiar power of coercion” over McKnight. See, e.g., Wajda v. R.J. Reynolds Tobacco Co., 103 F.Sup.2d 29, 37 (D.Mass. 2000). Nor has he been shown to have engaged in the kind of concerted action resulting in tortious conduct that sometimes supports a conspiracy claim. See, e.g., Kurker v. Hill, 44 Mass.App.Ct. 184, 188 (1998). Thus, Count VI cannot stand either.
Counts VII and IX against Troderman, seeking an accounting and injunctive relief are now moot. Troderman is not a corporate director or officer of the Company and he has none of its corporate records. He cannot be ordered to render any accounting to the shareholders. Nor can he be further enjoined from carrying out an engagement from which he has long since resigned.
By cross claims, Troderman additionally seeks indemnification and contribution from the Company, from Tesorero and from Osborne. Troderman is entitled to a declaration that he can receive indemnification from the Company to the extent it is needed. This indemnification flows from the contract for his engagement, the Trust Mortgage. See, e.g., Liberty Mutual Insurance Company v. Westerlind, 374 Mass. 524, 526 (1978); Magliozzi v. P&T Container Service Co., Inc., 34 Mass.App.Ct. 591, 592 n.1 (1993).
Insofar as Tesorero and Osborne are concerned, any indemnification or contribution for Troderman is of the common law variety. See, e.g., Fall River Housing Authority v. H.V. Collins Co., 414 Mass. 10, 14 (1992). Whether it is warranted must await a more complete painting of the picture.
ORDER
For the foregoing reasons, the motion by defendant Jeffrey S. Troderman for summary judgment against the plaintiff is ALLOWED, as is his motion on his cross claim against Paul D. Osborne Desk Company, Inc. The motion on the cross claims against Paul Tesorero and Paul Osborne is DENIED.

 See this Court’s memorandum and order of September 25, 2001.

 Counts III, IV, VI, VII and IX.

 Osborne is a grandson of a mem with the same name, Paul D. Osborne, for whom the Company is named.

 A predecessor trustee to McKnight, her other brother Mark A. Osborne, filed three law suits against Osborne and Tesorero in 1998, for breach of-fiduciary duty, theft of corporate opportunities, and other claims. Those claims were settled and dismissed without prejudice.

 McKnight agrees that Osborne and Tesorero were officers of the Company. She points out, however, that after the October 19, 1998 resignation of Mark Osborne and Michael Putziger as directors, Tesorero was the only remaining director. McKnight's complaint, however, alleges in paragraph 6 that “[a]t all times relevant to this action, Osborne . . . served on the Company’s board of directors.” She is bound by that allegation. G.L.c. 231, Sec. 87.

 The statutory amendments creating this Sec. (a) and Sec. (b) are noted above on p. 6.