## Varney Bros. Sand & Gravel, Inc., & another[1] *vs.* Rosemarie Champagne.

No. 96-P-1135.

Worcester. February 12, 1998. - December 23, 1998.

Present: Perretta, Jacobs, & Lenk, JJ.

*Corporation,* Officers and agents. *Agency,* Scope of authority or employment, Ratification. *Contract,* Employment, Validity, Ratification, Promissory estoppel. *Wills, Statute of.*

An "employment agreement" signed by a corporation's treasurer, granting an individual a life estate in corporate property and a lifetime stipend for past nursing services to the treasurer, was unenforceable where it was not authorized by the corporate board of directors. [59]

In an action seeking a declaration under G. L. c. 231A as to the enforceability of an "employment agreement" ostensibly between a corporation and a person providing personal services to the corporation's treasurer, there was insufficient evidence to support a finding that the treasurer, in signing the agreement, had apparent authority to bind the corporation [59-60]; further, the judge's conclusion that the corporation had not ratified the agreement was not clearly erroneous [60-61].

A contract to personally assume the obligations of a corporation with respect to an employment agreement if the employment agreement were held invalid by a court of competent jurisdiction, was, in the circumstances, not a testamentary instrument and was an enforceable contract against the estate of the maker. [61-63]

Civil action commenced in the Superior Court Department on June 1, 1992.

The case was heard by *Mary-Lou Rup,* J.

*Bartholomew P. Molloy* for the plaintiff.

*Pacifico M. DeCapua,* for the defendant, submitted a brief.

Perretta, J. Soon after the death of Richard C. Varney (Varney), the plaintiffs brought this action seeking a declaration

[1] Milford National Bank and Trust Company, as executor of the will of Richard C. Varney.

under G. L. c. 231A that two agreements between him and the defendant, Rosemarie Champagne, were null and void and of no force and effect. The first agreement was between the plaintiff Varney Bros. Sand & Gravel, Inc. (the corporation), was signed by Varney (as treasurer of the corporation) and Champagne, and concerned Champagne's employment as a nurse to the ailing Varney. The second agreement essentially incorporated the terms of the first but bound Varney personally to fulfil the corporation's obligations under the employment agreement in the event that either the corporation should refuse to do so or the employment agreement were found to be invalid. A Superior Court judge found and concluded that the employment agreement was unenforceable because Varney lacked the authority to bind the corporation to an agreement that fell outside the scope of its business and that the second agreement, Varney's personal contract, was a testamentary instrument which failed to meet the requirements of G. L. c. 191, § 1, the Statute of Wills. Although we see no error in the trial judge's conclusion that the employment agreement was not binding upon the corporation, we conclude that Varney's individual agreement with Champagne is an enforceable contract which took effect during his lifetime, and reverse the judgment in part.[2]

1. *The facts.* We take the facts relevant to the issues on Champagne's appeal from the trial judge's findings.[3] Varney Bros. Sand & Gravel, Inc., is a closely held Massachusetts corporation that manufactures ready-made cement. It also has

---

[2]Although the corporation prevailed in the Superior Court, it also appealed and claims that the trial judge erred in failing to declare the agreements in issue null and void on the basis of fraud in the inducement.

[3]There is ample support in the record for the trial judge's findings, and we, therefore, are bound by them. See Mass.R.Civ.P. 52(a), 365 Mass. 816 (1974). "What the clearly erroneous standard means is that the '[the judge's] findings "come here well armed with the buckler and shield." ' *First Pa. Mort. Trust* v. *Dorchester Sav. Bank,* 395 Mass. 614, 621 (1985), quoting *Matter of Multiponics, Inc.,* 622 F.2d 709, 723 (5th Cir. 1980). We are 'bound by [her] findings of fact which are supported by the evidence, which include inferences reasonably drawn therefrom.' *Ricky Smith Pontiac, Inc.* v. *Subaru of New England, Inc.,* 14 Mass. App. Ct. 396, 405 (1982). Thus, we shall not 'review questions of fact found by the trial judge, where such findings are supported "on any reasonable view of the evidence, including all rational inferences of which it was susceptible." ' *First Pa. Mort. Trust* v. *Dorchester Sav. Bank, supra* at 642, quoting *T.L. Edwards, Inc.* v. *Fields,* 371 Mass. 895, 896 (1976)." *Judge Rotenberg Educ. Center, Inc.* v. *Commissioner of the Dept. of Mental Retardation (No. 1),* 424 Mass. 430, 452 (1997).

numerous real estate holdings, including a cattle farm and six residential buildings. The corporation was founded by Varney's father and uncle. Upon their retirement, Varney ran the business until he became too ill to do so, but he retained his position as treasurer and director until his death in 1992. Varney's wife, Linda, served as the corporation's president, and she too was a director. Up until 1989, she had only limited involvement in the corporation's business, although she did manage the corporation's cattle farm.

In January, 1989, Varney and Linda, who lived with their children in a house owned by the corporation, separated, and Varney moved to a house, also owned by the corporation, situated at 131 Providence Road, Mendon. However, he remained in close contact with Linda and their family.

Throughout his later adult life, Varney suffered from a number of chronic debilitating illnesses, including coronary artery disease, hypertension, vascular disease, strokes, and heart attacks. About five months after Varney and Linda separated, the corporation's business manager, Barbara Jerrier, met Champagne, who told her that she was a nurse for a man who required round-the-clock care. Because of Varney's recent separation from Linda and his medical condition, Jerrier thought that Champagne would be a good companion for Varney. She introduced them to each other and a friendship developed.

In October of 1989, Varney and Champagne entered into a written agreement that provided that she would perform the duties of a live-in nurse, monitor his physical care and see to his medications and medical appointments, and, if and when necessary, perform incidental housekeeping chores.[4] At this time Champagne was employed as a health aide to a quadriplegic, working a forty-hour week and earning a weekly salary of $600. Varney agreed that Champagne could continue her daytime employment and be available to him, Varney, on an on-call basis for the remainder of her time for a weekly salary of $100. While working under this arrangement, Champagne received

---

[4]Champagne was a certified nurse's aide, nurse's technician I, and nurse's technician II with years of experience in her field. She had worked in a hospital psychiatric unit and with a visiting nurses' association. Additionally, she had done hospice and private duty work and had served as a home health aide. The trial judge expressly found that Champagne had discussed her education and experience with Varney prior to her employment with him, that she did not misrepresent her credentials, that he knew she was not a nurse, and that he neither hired nor relied upon her for medical services.

her weekly salary in the following manner. Sometime prior to the events in issue, Varney had made a substantial loan to the corporation which it was reducing by paying his personal expenses and deducting those payments from the amount of its indebtedness. When Varney entered into his agreement with Champagne, he instructed and authorized the corporation to issue a weekly check in the amount of $100, payable to him. The corporation would make a corresponding reduction in the amount of its outstanding indebtedness to Varney. Upon receipt of the check, Varney would endorse it over to Champagne.

Although Varney knew that Champagne was not a nurse, he nonetheless referred to her as his "nurse" and his "live-in nurse" in order to avoid potential problems in his pending divorce from Linda. Linda and other family members had a friendly relationship with Champagne and were satisfied with the services she was providing Varney.

When faced with possible surgery on his carotid artery in 1990, Varney drafted a letter which he sent to Jerrier and the attorney who represented him on matters pertaining to his estate and who was also the president of the plaintiff bank.[5] The letter makes specific reference to the impending surgery and goes on to provide: "In case of my demise, I hereby stipulate that my nurse Rosemarie Champagne, who has nursed me through bad health for the past 9 months, shall continue to reside at 131 Providence Rd., Mendon . . . at her discretion with all overhead cost maintaining the property. Including all utilities and real estate taxes to be paid from my estate or Varney Brothers Sand & Gravel, Inc. This will be rent free to Rosemarie Champagne, R.N." The designation of Varney as treasurer followed his signature on the letter, which was notarized by Jerrier. Varney's attorney gave him no advice concerning this letter; nor did he do anything in respect to it.

In May, 1991, because of the continuing deterioration of Varney's health, Champagne left her daytime position caring for another individual in order to care for Varney on a full-time basis. Her weekly salary from Varney was increased from $100 to $600, the same amount she had been receiving from her previous employer for a forty-hour week. Again, Varney instructed and authorized the corporation to issue a weekly check payable to him in the amount of $600, and to deduct that

[5]Jerrier and this attorney were also directors of the corporation.

amount from the corporation's indebtedness to him. He then would endorse the check over to Champagne each week. Linda knew and approved of this arrangement.

Varney's condition worsened, and in February, 1992, he was again scheduled to undergo risky surgery. At this time, he told Champagne that he wanted to marry her once his divorce became final. Because of the care and companionship Champagne had provided him, he also wanted to make provision for her should he not survive the operation. Rather than seeking the advice of the attorney who counseled him on matters of his estate, see note 5, *supra*, Varney contacted the attorneys representing him in his still-pending divorce action and arranged for the drafting of the agreements here in issue. Several days later, on February 25, 1992, the attorneys brought the agreements in issue to Varney, who was then in the hospital. After they and Varney discussed and reviewed the documents, he and Champagne signed them, and one of the attorneys notarized their signatures. Champagne, as Varney's employee and companion, spent her days and evenings at his bedside until his death on March 23, 1992.

Eight days after Varney died, Linda, in her capacity as president of the corporation, wrote to Champagne advising her of her intention "to have the house at 131 Providence Road become a productive business asset" and requesting that she vacate the premises before May 1. Champagne refused to move, asserting that she had agreements with the corporation and Varney that provided her with a life estate in the house. The corporation's board of directors then unanimously voted, on August 11, that Varney had not been authorized to enter into the employment agreement on behalf of the corporation, that the corporation had not ratified his action, and that his action was rejected, as ultra vires, by the corporation.

2. *The first agreement.* The first agreement in issue, labeled an "employment agreement," was between the corporation, signed by Varney as treasurer, and Champagne. The prefatory acknowledgments of the agreement recite that, in the circumstances of Varney's health, it was in the corporation's best interest to make provision for his care and comfort, that Champagne could provide him with necessary health services, and that the corporation desired to compensate her for her "past and present services to . . . Varney, as well as provide her with an incentive to provide further services" to him.

Under the terms of this agreement, Champagne was to reside in Varney's home and provide him with twenty-four-hour care as well as housekeeping services for which she would receive a weekly salary of $600, "from the commencement of this Agreement and continuing for the rest of her natural life . . . ." The compensation clause of the agreement also stated that the corporation was to provide or pay for Champagne's medical insurance "of the same nature and kind as the other employees" of the corporation. The agreement further provided that should Varney die before the expiration or termination of the agreement, she would have the "exclusive use and occupancy of the residence . . . for the term of her natural life" and that during her occupancy, the corporation "shall pay all expenses of the residence including but not limited to heat, electricity, utility charges and taxes and shall have no right to terminate this Agreement." The agreement was to be "automatically renewed annually" and could be terminated by either Champagne or the corporation during the lifetime of Varney; moreover, the corporation could not terminate the agreement without Varney's express written authorization.

Champagne argues that the corporation is bound by the terms of this agreement under any one of three theories: Varney's apparent authority to bind the corporation, the corporation's ratification of the agreement, and Champagne's detrimental reliance upon the agreement about which the corporation had knowledge. We see no error in the trial judge's conclusion that, on the facts found by her, this agreement was unenforceable.

a. *Apparent authority.* By its very terms, viz., giving Champagne a life estate in corporate property and a lifetime stipend for past nursing services to Varney, the agreement committed the corporation to obligations well outside the scope of its usual activity. See, e.g., *Braden* v. *Trustees of Phillips Academy*, 321 Mass. 53, 55-56 (1947); *Bloomberg* v. *Greylock Bdcst. Co.*, 342 Mass. 542, 548 (1961). For such a transaction to be valid, specific authorization by the board was required. See *Boston Athletic Assn.* v. *International Marathons, Inc.*, 392 Mass. 356, 365 (1984); *Kanavos* v. *Hancock Bank & Trust Co.*, 14 Mass. App. Ct. 326, 333 (1982).

Even assuming that this transaction could be enforced against the corporation upon a showing of Varney's apparent authority, there is nothing in the record that would support a finding to that effect. "The test for apparent authority is how the person

dealing with the agent reasonably interprets the agent's authority." *Greenstein* v. *Flatley,* 19 Mass. App. Ct. 351, 355 (1985).

Although the corporation might have been aware of the facts that Champagne was providing nursing care to Varney and that he was paying her $600 a week for those services, the corporation did nothing to arrange, secure, or facilitate those services. Champagne never received a paycheck or any other benefits from the corporation. Rather, the corporation sent a check to Varney, and he, in turn, endorsed it over to Champagne while the corporation accordingly reduced the amount of its debt to him.

Further, Varney's title, treasurer, was not, without more, sufficient to establish his apparent authority to bind the corporation to the agreement. As of May, 1991, Champagne was devoting all her time to caring for Varney. The trial judge found that by late 1991 Varney, who prior thereto had been doing some work from his home, had little involvement with the business of the corporation. The agreement was drafted by Varney's divorce attorneys who also brought it to the hospital for his and Champagne's signatures. These circumstances do not provide a basis for a finding that the corporation had acted in such a manner as to cloak Varney with the apparent authority to bind it to the agreement. See *Kanavos* v. *Hancock Bank & Trust Co.,* 14 Mass. App. Ct. at 331.

b. *Ratification.* "Where an agent lacks actual authority to agree on behalf of his principal, the principal may still be bound if the principal acquiesces in the agent's action, or fails promptly to disavow the unauthorized conduct after disclosure of material facts." *Linkage Corp.* v. *Trustees of Boston Univ.,* 425 Mass. 1, 18, cert. denied, 522 U.S. 1015 (1997). Also, "[r]atification of unauthorized acts of an agent is readily inferred where, after knowledge, the principal makes no effort to repudiate them." *Irving Tanning Co.* v. *Shir,* 295 Mass. 380, 384 (1936). Here, the trial judge found that Varney did not discuss either of the agreements with the corporation's officers or directors and that none of them either approved or ratified the first agreement.

Champagne claims that the trial judge should have inferred ratification of the agreement from the method of payment of her weekly salary and Varney's letter of May 22, 1990, to the corporation about which the president and vice-president of the corporation had knowledge. Whether the corporation ratified the agreement of February 25, 1992, by reason of the manner in

which Champagne had been paid for her services to Varney and the knowledge of two corporate officers of the contents of Varney's letter of May 22, 1990, was a question of fact for the trial judge. See *A.J. Armstrong Co.* v. *Bloomberg*, 285 Mass. 6, 9-10 (1933); *Linkage Corp.* v. *Trustees of Boston Univ.*, 425 Mass. at 18-19.

Even were we to assume that it would have been reasonable for the trial judge to infer ratification from those two facts, she did not draw the inference. "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Gallagher* v. *Taylor*, 26 Mass. App. Ct. 876, 881 (1989), quoting from *Anderson* v. *Bessemer*, 470 U.S. 564, 573-574 (1985). The trial judge's decision not to infer knowledge by the corporation from the method in which Champagne received her weekly salary from Varney was based upon a permissible view of the evidence. The same may be said about Varney's letter of 1990, the terms of which are different in several respects from the agreement Champagne seeks to enforce.[6]

c. *Estoppel.* From all that appears in the record before us, the claim of estoppel is being raised for the first time on appeal. Clearly, Champagne did not plead estoppel, and the trial judge did not consider or pass upon the issue. See *Anthony's Pier Four, Inc.* v. *HBC Assocs.*, 411 Mass. 451, 471 (1991). In any event, Champagne's sole argument on this theory is based upon the claim that the corporation had knowledge of the "types of contracts [Varney] was executing with [Champagne] and not only said nothing to disavow his authority to do so, but issued the checks used to pay [Champagne]." It follows from what we have said in respect to the trial judge's findings of fact on Champagne's claims of apparent authority and ratification that the theory of estoppel also fails.

3. *The second agreement.* Under the terms of the second agreement signed by Varney and Champagne on February 25, 1992, Varney promised to assume all the responsibilities and obligations of the corporation under the first agreement in the event that the corporation failed "to honor said employment agreement after the death of Varney or in the event that said agreement is held to be invalid by a court of competent jurisdic-

---

[6]That letter, which made no mention whatsoever of a lifetime stipend for Champagne, reasonably could be construed as intended by Varney to have effect only if he did not survive that particular surgery.

tion." This agreement also provides that it "shall survive Varney's death and shall be binding upon his heirs, successors and assigns, but shall automatically terminate upon the death of Champagne." The trial judge concluded that this agreement was a testamentary instrument which was unenforceable because it had not been attested and subscribed in accordance with the requirements of G. L. c. 191, § 1. We conclude that the second agreement is a valid contract binding upon his estate.

The trial judge's ultimate determination, that the agreement was a testamentary instrument, rests upon her conclusion that the agreement was to be effective only upon Varney's death. "A testamentary disposition becomes operative only upon and by reason of the death of the owner who makes it." *National Shawmut Bank* v. *Joy,* 315 Mass. 457, 471 (1944). See *In re Jones,* 379 Mass. 826, 834 (1980).

Implicitly, the key to determining whether a disposition is testamentary is when it takes effect. See, e.g., *Tewksbury* v. *Tewksbury,* 222 Mass. 595, 597 (1916) (requiring an intent to convey a present interest to avoid Statute of Wills); *Castle* v. *Wightman,* 303 Mass. 74, 76-78 (1939) (creating a present interest in property to be received at death does not violate Statute of Wills); *Legro* v. *Kelley,* 311 Mass. 674, 676 (1942) (creating by contract a bona fide equitable interest in property and its enforcement after death does not violate Statute of Wills). Further, the underlying motive for the transfer is not relevant. "If an owner of property can find a means of disposing of it inter vivos that will render a will unnecessary for the accomplishment of his practical purposes, he has a right to employ it. The fact that the motive of a transfer is to obtain the practical advantages of a will without making one is immaterial." *National Shawmut Bank* v. *Joy,* 315 Mass. at 471. *Blanchette* v. *Blanchette,* 362 Mass. 518, 524-525 (1972). *In re Jones,* 379 Mass. at 835.

According to the provisions of the first agreement, it took effect on the day it was signed by Varney and Champagne, February 25, 1992. By the terms of the second agreement, Varney assumed all the corporation's obligations under the first agreement in the event of two disjunctive occurrences: that the corporation "fails to honor said employment agreement after the death of Varney *or* in the event that said agreement is held to be invalid by a court of competent jurisdiction" (emphasis supplied). Because in conceivable circumstances the first agreement could

have been judicially determined to be invalid during Varney's lifetime, had he survived, we conclude that it is not a testamentary instrument and, instead, is an enforceable contract.

Our conclusion, that this agreement is a valid contract, is limited to the weekly stipend and insurance benefits promised Champagne and does not extend to the life estate in the Mendon property.[7] As discussed in part two of this opinion, *supra*, that residence was owned by the corporation and is not part of Varney's estate. We see no reason, however, why the failure of the life estate should have an effect on the validity of the guaranteed stipend and medical insurance. See *Pettingell* v. *Morrison, Mahoney & Miller*, 426 Mass. 253, 258 (1997) ("We see no reason not to enforce the agreement generally but deny enforcement of the offending provision").

4. *The cross appeal.* The corporation and the executor of Varney's estate argue that, because Champagne had misrepresented her nursing credentials to Varney, both agreements were null and void on the basis of fraud in the inducement. This argument warrants no discussion beyond what we stated in respect to the trial judge's findings on that matter, see note 4, *supra*, and in general. See note 3, *supra*.

5. *Conclusion.* Paragraph two of the judgment, declaring the second agreement of February 25, 1992, between Rosemarie Champagne and Richard C. Varney, personally, null and void, is to be modified to declare that the second agreement is an enforceable contract with respect to its weekly stipend and medical insurance provisions. As so modified, the judgment is affirmed.

*So ordered.*

---

[7]Champagne has never argued that the guaranty should be enforced with payment to her for the cost of a rental equivalent to the property in which she claimed a life estate.