Barrett, J.
Initially, the plaintiff nursing home (JML), alleging breach of contract, sued Ruth S. Hervey (Hervey), a patient, for the balance due for her daily charges. Subsequently, Hervey died, and Jodee P. Bishop (Bishop), the executrix of Hervey’s will, was substituted as the defendant. After trial, the trial judge found in favor of Bishop and ordered the complaint dismissed. JML appeals under Dist./Mun. Cts. R. A. D. A., Rule 8C. We affirm the trial judge’s decision.
We state the basic facts as found by the trial judge.[2] On June 5, 1998, Hervey, then 88 years of age, who had been treated in the Falmouth Hospital since June 1,1998 for a fractured femur, was transferred to JML, an affiliate of Falmouth Hospital Foundation. The day she presented to JML she was unconscious in a wheelchair. The Admissions Coordinator for JML, Judith Rebello (Rebello), had known Hervey for about 20 years.[3] Accompanying Hervey was her longtime assistant and friend, Shirley Dugan (Dugan), whom Rebello had also known for many years. In order to admit Hervey into JML, Rebello asked Dugan if she would mind signing and initialing the Admissions Agreement (the Agreement). Rebello knew that Dugan did not have a power of attorney for Hervey, and that Attorney Bishop did.
Rebello gave Dugan a cursory review of the Agreement. Dugan did not read the Agreement and only signed and initialed it to facilitate Hervey’s admission *64 and to accommodate Hervey and Rebello. Dugan did not sign with an intent to bind Hervey financially. Indeed, Rebello did not believe that the Agreement financially committed Hervey’s funds because Hervey was not being admitted as a private patient, but rather “under Medicare.” One of the addenda to the Agreement, signed by Rebello, indicated JML’s understanding that Hervey’s care needs were short term. In addition to the Agreement, Dugan completed an “Application for Admission for Short Term Care.”
The Agreement that Dugan signed provided for a daily room rate of $265.00, and stated that a copy of JML’s rate schedule had been furnished to the Resident (Hervey) and the Responsible Party (none indicated). Rebello neither gave a copy of the Agreement to Dugan nor tried to communicate with Bishop about Hervey’s admission. She did place an admissions packet, which contained rate information regarding various categories of rooms at JML, on the bedside table in Hervey’s room. Rebello never saw that packet again.
A day or two after Hervey’s admission, Bishop learned that Dugan had helped with Hervey’s admission in JML. Bishop did not call JML because she did not distinguish Hervey’s admission to Falmouth Hospital from her admission to JML, and because she did not know that Dugan had purportedly contracted a specific room rate. JML knew that Bishop had a power of attorney for Hervey, and representatives of JML reported to Bishop occasionally regarding Hervey’s care. However, they did not discuss Hervey’s financial situation with Bishop.
Prior to August 27,1998, when Hervey’s Medicare benefits ran out, Bishop spoke twice with a representative of JML about the continuation of Hervey’s stay at JML after August and the range of room rates available. The range was from $185.00 to $265.00. In late August, 1998, Bishop began receiving invoices for Hervey’s stay at JML. The amounts, depending on the number of days in the month and telephone charges, varied slightly from month to month. The room rate charged was $185.00, rather than the $265.00 provided for in the Agreement. On August 27, 1998, Bishop, in a telephone conversation with a JML employee, indicated she was still entertaining the thought that Hervey might return home, with 24-hour care. However, on September 16, Bishop was informed that Hervey needed more care than would be available at her home. Bishop then agreed that Hervey would remain at JML for the long term. At that time, Bishop was again advised of the various room rates. Bishop continued to receive invoices for Hervey’s care, with a per diem rate of $185.00, until June, 2000. Bishop paid the amount requested in each invoice.
In a letter dated June 14, 2000, Charles Peterman (Peterman), JML’s president and chief executive officer, wrote to Bishop advising that an “oversight” and a “computer error” had resulted in Hervey being erroneously billed at the room rate of $185.00 per day, rather than $265.00 per day rate, as indicated in the Agreement. This error had continued for a period of 650 days, resulting in an outstanding balance due JML of $52,000.00. Peterman indicated that the problem had been corrected, but that JML was looking to collect the aforementioned outstanding balance. Bishop responded that, for various reasons, she could not advise Hervey to pay any amount of which she was not properly notified or billed. Starting in July, 2000, Bishop began paying the daily rate of $265.00, and when it was increased to $275 per day, paid that rate, until Hervey’s death on January 24, 2002.
*65 We review the fact findings of the trial judge for clear error. We review his ruling of law denying plaintiffs claim for quantum meruit and his ruling that ratification can only occur in the context of a principal-agency relationship.
First, concerning the dismissal of plaintiffs quantum meruit claim, it is clear that recovery on such a theory will generally not lie where the court finds the existence of a valid and enforceable contract. J.A. Sullivan v. Commonwealth, 397 Mass. 789, 793 (1986); Boswell v. Zephyr Lines, Inc., 414 Mass. 241, 250; Zarum v. Brass Mill Materials Corp., 334 Mass. 81, 85 (1956). Theories of recovery such as quantum meruit, quasi contract and implied contract are equitable in nature and are intended to prevent unjust enrichment.[4] Salamon v. Terra, 394 Mass. 857, 859 (1985). Where a valid contract does not exist or cannot be enforced, but one party has conferred a benefit upon another with the expectation of payment, and the receiving party accepts that benefit also with knowledge and an expectation of payment, the courts have formulated a remedy to compensate the rendering party, despite finding no enforceable contact. Bolen v. Paragon Plastics, Inc., 747 F. Supp. 103 (D. Mass. 1999). Here, the court found the existence of a valid contract. The terms of that contract provided for Hervey to pay $185.00 per day during her stay with JML. The terms of the contract, as it relates to the per diem rate, were established by the rendering of monthly invoices, which Bishop accepted and paid. There was no failure of consideration, which might have permitted an equitable recovery even in the face of this contract. Green v. Boston Safe Deposit and Trust Co., 255 Mass. 519, 522-23 (1926). Nor is this a situation for contract reformation, where a mutual mistake of fact occurred concerning the per diem rate. Ducleraint v. Federal National Mortgage Ass’n., 427 Mass. 809, 813 (1998). The mistake between these parties was not mutual, but unilateral, and JML made it. Hervey paid the amount requested by plaintiff and there is no evidence which requires this court to substitute its findings for those of the trial judge, to the effect that Bishop knew she was paying the wrong rate. While such a finding may have been permissible, upon the evidence here, it was not “clearly erroneous” to conclude otherwise.[5] Plaintiffs quantum meruit claim was properly dismissed.
Although not directly addressed by JML in its brief, the question of whether or not the trial judge erred in finding Dugan was not acting as the agent of Hervey, or Bishop, when she executed the Admissions Agreement was raised in the Notice of Appeal.[6] As a question of fact, such a finding is within the purview of the trial judge and will not be disturbed unless clearly erroneous. Bradley v. Meltzer, 245 Mass. 41, 43 (1923); Rule 52(c) of the Mass. R. Civ. P. We find sufficient evidence in the record to support the court’s conclusion that no agency relationship was intended or existed. The lack of agency in this case is *66 well supported by the testimony of both Dugan and JML employee, Rebello, both of whom confirmed that Dugan’s act in signing the Admissions Agreement was merely to facilitate Hervey’s admission. At the time of the signing, Hervey was unconscious and Bishop was unaware that Dugan was signing the Agreement. There was no expressed or apparent intention to bind Hervey financially, as she was being admitted under Medicare, not as a private-pay patient. Further, Dugan was not Hervey’s attorney-in-fact and Rebello, who was the JML employee initially charged with admitting Hervey, was aware of all of these facts.
In arguing for ratification by Bishop of Dugan’s act in signing the Admissions Agreement, JML cites the case of Gross v. Cohen, 236 Mass. 468 (1920) to support its contention that ratification may occur even where no agency relationship is established. In Gross, however, there is no question but that the agent acted with the knowledge and permission of her principal (the landlord) in executing a lease. The principal herself sought to enforce the lease and the tenant claimed the lease invalid because the agent lacked proper authority to execute a document under seal. The lessee argued that the agent’s grant of authority, not itself being under seal, rendered the lease invalid. The court rejected this argument, holding that the filing of suit by the principal was a ratification of the agent’s action in executing the lease, whether or not the agent’s authority was under seal.[7]
Presuming, for the moment, that an agency relationship was established, this court considers the holding in Scott v. Combs, 94 Mass. 493, 496-97 (1866) on the question of ratification, as controlling:
The general rule is perfectly well settled, that a ratification of the unauthorized acts of an agent, in order to be effectual and binding on the principal, must have been made with a full knowledge of all material facts, and that ignorance, mistake or misapprehension of any of the essential circumstances relating to the particular transaction alleged to have been ratified will absolve the principal from all liability by reason of any supposed adoption of or assent to the previously unauthorized acts of an agent. We know of no qualification of this rule....
Ratification of a past and completed transaction, into which an agent has entered without authority, is a purely voluntary act on the part of a principal. No legal obligation rests upon him to sanction or adopt it. No duty requires him to make inquiries concerning it. Where there is no legal obligation or duty to do an act, there can be no negligence in an omission to perform it. The true doctrine is well stated by a learned text writer: ‘If I make a contract in the name of a person who has not given me an authority, he will be under no obligation to ratify it, nor will he be bound to the performance of it.’ 1 Livermore on Agency, 44. See also Paley on Agency, 171, note o. Whoever, therefore, seeks to procure and rely on a ratification is bound to show that it was made under such circumstances as in law to be binding on the principal, especially to see to it that all material *67 facts were made known to him. The burden of making inquiries and of ascertaining the truth is not cast on him who is under no legal obligation to assume a responsibility, but rests on the party who is endeavoring to obtain a benefit or advantage for himself. This is not only just, but it is practicable. The needful information or knowledge is always within the reach of him who is either party or privy to a transaction which he seeks to have ratified, rather than of him who did not authorize it, and to the details of which he may be a stranger.
We do not mean to say that a person can be wilfully ignorant or purposely shut his eyes to means of information within his own possession and control, and thereby escape the consequences of a ratification of unauthorized acts into which he has deliberately entered; but our opinion is that ratification of an antecedent act of an agent which was unauthorized cannot be held valid and binding, where the person sought to be charged has misapprehended or mistaken material facts, although he may have wholly omitted to make inquiries of other persons concerning them, and his ignorance and misapprehension might have been enlightened and corrected by the use of diligence on his part to ascertain them.
Even had there been a principal-agent relationship between Bishop and Dugan, this trial judge expressly chose not to find ratification, citing a lack of evidence convincing him that Bishop had actual or imputed knowledge Hervey was being billed at an incorrect rate; a rate different from what Dugan had allegedly agreed to pay.[8] Ratification, too, is a question of fact for the trial judge. Varney Bros. Sand & Gravel, Inc. v. Champagne, 46 Mass. App. Ct. 54, 61 (1998). It requires informal acquiescence of a principal to an agent’s conduct. That acquiescence can be inferred from a finding that a principal failed to promptly disavow the agent’s conduct, after learning what action the agent had taken in the principal’s behalf. Linkage Corp. v. Trustees of Boston Univ., 425 Mass. 1, 18-19 (1997). While there was some evidence that Bishop may have been told of the higher rate charged in the Holly Point section of plaintiff’s facility, the evidence is insufficient to require a trier of fact find that Bishop knew Hervey was being undercharged based upon the contract signed by Dugan.
JML further urges that Bishop’s payment of the higher rate beginning in July, 2000 was itself sufficient to require the trial judge find ratification of the Agreement, relating back to its original date. Appellant fails to recognize that Bishop, once notified of JML’s mistake, refused to take responsibility for the mistake and further refused to reimburse the facility for the alleged arrear-age. Bishop’s agreement to pay the higher amount, prospectively, does not require a finding that Bishop accepted responsibility for the alleged underpayment, especially in light of Bishop’s letter of July 28, 2000, disavowing *68 such responsibility. Further, there was no condition placed upon Bishop, from which ratification could be inferred, that Hervey could only continue in residence if she not only paid the higher rate but also agreed to pay the claimed arrearage.
Finding no error in fact or law, we uphold the decision of the trial judge and dismiss this appeal.
So ordered.

 Rule 52(c) of the Mass. R. Civ. P. provides, in part, that findings of fact in a District Court action tried upon the facts without a jury shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses. “Stated another way, the Appellate Court should not review findings of fact by the trial judge where the findings are supported ‘on any reasonable view of the evidence, including rational inferences of which [the evidence] was susceptible.’” Hurwitz v. Helen’s Bakery, Inc., 1992 Mass. App. Div. 88-89 (1992), citing T.L. Edwards, Inc. v. Victor G. Fields, 371 Mass. 895 (1976).

 Hervey had been a patient of JML in 1995, and again in June 1996, following a fractured wrist.

 Massachusetts courts treat recoveries under theories of quantum meruit, quasi-contact, implied contact and unjust enrichment in a similar fashion. See Bolen, infra at 107.

 “A finding is ‘clearly erroneous’ when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.” J.A. Sullivan Corp. v. Commonwealth, 397 Mass. 789, 792 (1986), citing United States v. United States Gypsum Co., 33 U.S. 364, 395 (1948).

 Paragraph #1 of the Notice asks, “Whether the trial judge erred in ruling that Shirley Dugan did not have apparent or implied authority to execute the Admissions Agreement on behalf of Ruth Hervey.”

 JML also relies upon Bartlett v. Zucker, 104 Mass. 336 (1870) which this court finds equally unconvincing as it deals with an individual (supposed agent) who executes promissory notes in the names of fictitious individuals.

 Hervey is the true principal here, but the evidence is that she was unconscious at the time of her admission to JML and otherwise had little to do with the management of her affairs during the period in question. Prior to her admission, Hervey had granted a durable power of attorney to Bishop. As Hervey’s attorney-in-fact, Bishop became the principal whom JML argued ratified Dugan’s signing of the Admissions Agreement by keeping Hervey in the Holly Point section of the facility after learning the charge for that section was $265.00 per day.