Curran, Dennis J., J.
Under a written contract, Russo’s Marine Mart, Inc. sold a 44-foot power boat to Susan G. Harris and William Harris, for $650,000, a sum that the Harrises chose to entirely finance at an interest rate of 9.42 percent over twenty years. The Harrises agreed to pay finance charges of $809,644, for a total owed payment of $1,459,644. After making a number of monthly payments to Century Bank, to which Russo’s had assigned the contract, the Harrises sought to reduce the interest rate, with no agreement ultimately reached. The bank subsequently re-assigned the contract back to Russo’s, which then sought due payments from the Harrises. The Harrises stopped making any payments, and Russo’s claimed the Harrises defaulted. In its complaint, Russo’s alleges that the Harrises breached the contract. The Harrises counterclaimed, invoking G.L.c. 231Ato seek a declaration that the contract is not enforceable against them, and that they were victims under G.L.c. 93A, §9.
The matter is before the court on the parties’ cross motions for summaiy judgment as to all claims.
*381 For the following reasons, Russo’s motion for summaryjudgment is ALLOWED, and the Harrises’ motion for summary judgment is DENIED.
BACKGROUND
The summary judgment record reveals the following facts.
Russo’s is a Massachusetts corporation that sells power boats. Sometime in 2005, the Harrises purchased a 30-foot Sea Ray “Sundancer” from it. The next year, they traded in that boat and purchased a 34-foot “Sundancer” from Russo’s. The very next year, on July 24, 2007, they traded in that boat as well and bought a 44-foot Sea Ray “Sundancer” from Russo’s, along with two powerful diesel engines. Each time the Harrises purchased a boat from Russo’s, all parties entered into a written “Retail Installment Sale Agreement.” This case concerns the contract that the parties entered into on July 24, 2007 (the “Contract”).
Under the terms of the Contract, the Harrises promised to pay $650,000, which represented the cost of the power boat, and further, agreed to repay the amount financed, with finance charges accruing at an average interest rate of 9.42 percent over twenty years. The Contract recited that these finance charges would total $809,644 by the end of this term, and thus the Harries specifically agreed to pay a total of $1,459,644. The payment of this owed amount was scheduled .to occur in monthly installments: for the first 10 years, the Harrises agreed to pay $5,953.82 per month, at an interest rate of 9.25 percent, and for the next 10 years, $6,209.88 per month, at an interest rate of 10.25 percent.
The Contract further recited that the Harrises had made a cash down payment of $210,343.81, and with a net trade-in amount of $10,486.19, had made a total down payment of $220,830. The total sale price of the boat was therefore listed as $ 1,680,474, which constituted the total down payment plus the total owed amount. The Harrises were to begin making monthly payments on August 23, 2007.
The Contract contained the usual miscellany of clauses: a “Security” clause that provided that the Harrises were giving Russo’s a security interest in the boat and engines in order to secure the Harrises’ performance under the Contract’s terms; an “Assignment” clause that Russo’s was assigning its rights, title, and interest in the Contract to the Bank, with Russo’s, as the seller, warranting in part that the statements in the agreement were “true and correct,” and that “[t]he down payment was made by the buyer in the manner stated on page 1" of the Contract; a ’’Default" clause that the Harrises, as the purchasers, would default if they failed to make a full payment when due; and finally, a “Remedies” clause that if the Harrises defaulted, Russo’s could immediately require them to pay the remaining unpaid balance of the amount financed and any related finance charges.
The Contract was signed by Maribeth Pochini, a Russo’s business manager, and the Harrises. It stated that the Harrises agreed to its terms and acknowledged that they had received a copy. At the time they entered into the Contract, the Harries believed that they had the financial assets to make the required monthly payments. On August 23, 2007, the Harrises made their first payment to the bank, and continued to timely make such payments for the next two years. A few months after signing the Contract, the Harrises received a copy of the Contract in the mail.
In late 2009, the bank began to investigate purported misrepresentations made by Russo’s in certain loan applications that it had submitted, including a loan application relied upon by the bank when it agreed to the assignment of the Contract. On December 11, 2009, the bank and Russo’s entered into a written Recourse Agreement that related to these misrepresentations. That agreement provided in part that: (1) the Contract (along with seven other “Retail Installment Sale Agreements” that had been assigned to the bank) would thereafter be “deemed to be an assignment with recourse by the bank against [Russo’s) for loss or damage”; (2) Russo’s would indemnify the bank “for any loss sustained by it because of judicial setoff or as a result of any judgment, settlement, or recovery against the Bank arising out of any claim or defense the buyer[s] named in the [retail installment sale agreements] has/have against [Russo’s]”; (3) the bank would continue to hold these retail installment sale agreements, as an assignee of Russo’s, so long as the each such agreement was paid on a current basis by the purchaser; and (4) Russo’s would purchase such agreements upon written demand of the bank where a required payment by a purchaser had become than more than 30 days past due.
On December 15, 2009, David Woonton, the manager of the bank’s commercial lending department, prepared a “Suspicious Transaction Report” concerning certain activity by Russo’s: that Pochini, as business manager of Russo’s, had represented to the bank that the Harrises had made a down payment in the amount of $210,343.81 when, in fact, they had made no such payment.
On or about December 18, 2009, Mr. Harris wrote to Timothy Glynn of the bank, seeking to reduce the interest rate detailed in the Contract. Mr. Harris’s plaint was that distressing economic times had caused the couple’s income to decrease from $936,646 in 2007 to $668,876 in 2009. He requested that the bank lower the interest rate on the balance owed to between five and six percent.
On or about May 20, 2010, Mr. Harris wrote a similar letter to Barry Sloane of the bank, admitting that his company, DMB Financial, LLC,[1] “was not doing well” and that the Harrises were no longer “making pretiy good money.” He stated that they did not want “to get [themselves into a repossession sta *382 tus” with the boat, that they did want “to make good on the loan,” and that they were “willing to sell the boat (if possible) and continue to pay off the difference to the bank over the remaining years left on the loan.” As in his letter to Mr. Glynn, Mr. Harris asked if the bank could lower the interest rate to between 5 and 6 percent so that they could “continue to make good on the loan.”
On June 1, 2010, the bank informed the Harrises that it would modify the Contract’s payment terms by lowering the interest rate to seven percent, as long as the Harrises paid both the amount they currently owed and an additional transaction cost of $3,000. The Harrises refused.
In July 2010, Mr. Harris voluntarily surrendered the boat to Russo’s so it could sell it to a third party on the Harrises’ behalf. Russo’s stored the boat on its property while attempting to sell it. Soon after, Russo’s re-purchased the boat from the Harrises for $360,000, and paid that amount to the bank in their behalf.
On August 10, 2010, the bank notified the Harrises that it had reassigned its rights, title, and interest in the Contract to Russo’s. A few days later, Mr. Harris met with representatives of Russo’s to discuss payment of the amounts owed under the Contract. On September 2, 2012, Russo’s sent the Harrises a proposed “Loan Modification Agreement,” in which it offered to- accept payment of the remaining balance owed under the Contract, which was $271,406.57, at an interest rate of 5 percent over a 200-month term, or $2,002.77 per month,- with monthly payments to begin on September 10, 2010. The Harrises did not sign this agreement.
On December 17, 2010, counsel for Russo’s wrote the Harrises to notify them that they had defaulted because they had failed to make required monthly amounts, and that, as of November 10, 2010, the total arrearage due was $41,676.54. On April 14, 2011, counsel for Russo’s again wrote to the Harrises, stating that it had received their earlier communication in which they had challenged the amount owed. He further stated that the Harrises’ contractual default meant that their payment obligations could be accelerated, with $674,558.63 constituting the total amount still owed. Finally, he informed the Harrises that Russo’s intended to dispose of the boat through a private sale to occur sometime after April 25, 2012, and that a deficiency would likely exist after this sale. In May 2011, Russo’s sold the boat for $350,000, resulting in just such a deficiency.
DISCUSSION
I. Standard of Review
Under the established standard, summary judgment will be granted where, viewing the evidence in the light most favorable to the non-moving party, all material facts have been established, and the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c); Cabot Corp. v. AVX Corp., 448 Mass. 629, 636-37 (2007). To prevail on its summary judgment motion, the moving party must affirmatively demonstrate the absence of a triable issue, and that the summary judgment record entitles it to ajudgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). If the moving party does not have the burden of proof at trial, it may demonstrate the absence of a triable issue either by submitting affirmative evidence that negates an essential element of the opponent’s case or “by demonstrating that proof of that element is unlikely to be forthcoming at trial.” Flesner v. Technical Commc’ns Corp., 410 Mass. 805, 809 (1991). Where the moving party has satisfied its burden, the nonmoving party must “go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.” (Internal quotations omitted.) Kourouvacilis v. General Motors Corp., 410 Mass. 706, 714 (1991).
II. Russo’s Breach of Contract Claim
In Counts I and II of its complaint, Russo’s alleges that the Harrises breached the contract because they failed to pay monies due under the Contract. To succeed on a claim of breach of contract, Russo must establish that: (1) a contract existed between the parties; (2) Russo performed its material obligations under the contract; (3) the Harrises breached a material obligation under the contract; and (4) damages resulted from the breach. See Singarella v. Boston, 342 Mass. 385, 387 (1961); Precision Piping Assocs., Inc. v. Boston, 3 Mass.App.Ct. 148, 149 (1975); Loranger Constr. Corp. v. E.F. Hauserman Co., 1 Mass.App.Ct. 801, 801 (1973).
The record demonstrates that Russo’s and the Harrises entered into the Contract on July 24, 2007. Under the terms of that Contract, the Harrises wanted and received a 44-foot power boat and agreed to make monthly payments over a 20-year period that would total $1,459,644. While the Contract was originally assigned to the bank, it was later reassigned from the bank to Russo’s. The Harrises breached the Contract by failing to make due monthly payments to Russo’s and defaulting on the Contract. Damages resulted from this breach in the form of the amounts still owed under the Contract. Russo’s has thus satisfied its burden of affirmatively demonstrating that the Harrises breached the contract.[2]
The Harrises seek to avoid their payment obligations because they claim that Russo’s misrepresented that they had made a cash down payment on the boat, and that they relied upon this misrepresentation in entering into the Contract.
A party has a right to rescind a contract based upon a misrepresentation where it can satisfy four requirements: (1) there was a misrepresentation of fact; (2) the misrepresentation was fraudulent or material; (3) the misrepresentation induced the party to enter into *383 the contract; and (4) the party was justified in relying upon the misrepresentation. See Green v. Harvard Vanguard Med. Assocs., Inc., 79 Mass.App.Ct. 1, 11 (2011); John Hancock Mut. Life Ins. Co. v. Banerji, 62 Mass.App.Ct. 906, 909 (2004); Restatement (Second) of Contracts §164 (1981). A contract induced by such a misrepresentation is not void ab initio, but rather voidable at the election of the party that justifiably relied upon the misrepresentation. Shaw's Supermarkets, Inc. v. Delgiacco, 410 Mass. 840, 842 (1991).
Viewing the evidence in the light most favorable to the Harrises, the Contract misrepresented that the Harrises had made a cash down payment of $210,343.81. However, there is no evidence whatsoever that this misrepresentation induced the Harrises to enter into the Contract. The Harrises knew that they had not made any such down payment, and that they had received, and indeed, enjoyed a 44-foot power boat by agreeing to pay $5,953.82 per month for the first 120 months, and $6,209.88 per month for the next 120 months. Moreover, at the time the parties entered into the Contract on July 24, 2007, the Harrises had believed they had the financial wherewithal to make these monthly payments, and indeed, for the next two years did make timely payments. For these reasons, the Harrises have failed to designate specific facts in the record showing there is a genuine issue as to whether the Contract may be rescinded on the ground of misrepresentation.
Russo’s is therefore entitled to judgment as a matter of law on its breach of contract claim.[3]
III. The Harrises’ Request for Declaratory Judgment
In Count I of their counterclaim, the Harrises seek a declaration that the Contract and therefore their payment obligations under the Contract are unenforceable. Under G.L.c. 231A, §1, this Court “may on appropriate proceedings make binding declarations of right, duty, status and other legal relations sought thereby, either before or after a breach or violation thereof has occurred in any case in which an actual controversy has arisen.” See Varney Bros. Sand & Gravel, Inc. v. Champagne, 46 Mass.App.Ct. 54, 55 (1998) (appropriate for judge to rule on plaintiffs request for declaration that agreements between plaintiff and defendant were null and void and of no force and effect).
In the present case, an actual controversy has arisen with respect to the enforceability of the Contract against the Harrises as to whether they have the right to rescind the Contract in order to avoid their payment obligations. As such, this Court is obligated to declare the rights of the parties, regardless of which party sought a declaration. See Mscisz v. Kashner Davidson Sec. Corp., 446 Mass. 1008, 1010 (2006), quoting Cherkes v. Westport, 393 Mass. 9, 12 (1984) (”[I]n a properly brought action for declaratory relief],] there must be a declaration of the rights of the parties even though relief is denied to the plaintiffs . . .”). For the reasons stated above, the Harries do not have a right to rescind the Contract on the grounds of misrepresentation; to the contrary, Russo’s has the right to enforce the Contract against the Harrises.
IV. The Harrises’ Chapter 93A, §9 Claim
In Count II of their counterclaim, the Harrises allege that Russo’s violated G.L.c. 93A, §9, because it misrepresented in the Contract that the Harrises had made a cash down payment. That statute provides, in pertinent part, that “any person . . . who has been injured by another person’s use or employment of any method, act or practice declared to be unlawful by section two . . . may bring an action in the superior court.” G.L.c. 93A, §9(1). A prerequisite to bringing an action under section 9 is a demand letter sent 30 days before suit that, at a minimum, describes with reasonable specificity the acts complained of and the injury suffered. G.L.c. 93A, §9(3). While not raised by the parties, this Court rules that the Harrises’ failure to allege in their counterclaim that they sent Russo’s such a demand letter defeats their action.[4] See Boston v. Aetna Life Ins. Co., 399 Mass. 569, 574 (1987) (“The failure of the [plaintiff] to allege the sending of a demand letter is fatal to its [sjection 9 claim”); Slaney v. Westwood Auto, Inc., 366 Mass. 688, 704 (1975) (Section 9 claim has special elements that must be alleged, including that the plaintiff sent a demand letter to the prospective defendant).
Assuming arguendo that Russo’s failure to raise this issue in its submissions constitutes a waiver of this pleading requirement, see York v. Sullivan, 369 Mass. 157, 163-64 (1975), Russo’s acts did not violate section 9 as a matter of law. “A ruling that conduct violates G.L.c. 93A is a legal, not a factual, determination.” R.W. Granger & Sons, Inc. v. J&S Insulation, Inc., 435 Mass. 66, 73 (2001). While a seller’s misrepresentation in a contract with a buyer may be “unfair” or “deceptive” under G.L.c. 93A, §2, such conduct is only actionable if there is “a causal connection between the seller’s deceptive act and the buyer’s injury or loss." Casavant v. Norwegian Cruise Line Ltd., 460 Mass. 500, 503 (2011). See also Hershenow v. Enterprise Rent-A-Car Co. of Boston, Inc., 445 Mass. 790, 798 (2006) (“[A] plaintiff seeking a remedy under G.L.c. 93A, §9, must demonstrate that even a per se deception caused a loss”).
The record contains no evidence that the misrepresentation of a cash down payment in the Contract induced the Harrises to enter into the Contract, or, in section 9 terms, that this misrepresentation caused their loss. See Lily Transp. Corp. v. Royal Inst. Servs., Inc., 64 Mass.App.Ct. 179, 204 (2005), quoting Fernandes v. Rodrigue, 38 Mass.App.Ct. 926, 928 (1995) (“[A] consumer plaintiffs claim of violation of [G.L.c. 93A] based solely on an underlying but merit-less claim for common-law fraud is itself without merit.... because it ‘is absorbed in and vanishes with *384 the [meritless] misrepresentation claim.’ ”); Lord v. Commercial Union Ins. Co., 60 Mass.App.Ct. 309, 322-23 (2004) (plaintiff did not make a case under section 9 where the defendant’s unlawful act or practice was not the cause of the plaintiffs injury). Accordingly, Russo’s has demonstrated the absence of a triable issue with respect to the Harrises’ claim under G.L.c. 93A, §9, and it is entitled to judgment as a matter of law on this claim.
ORDER
For these reasons, it is hereby ORDERED that the plaintiff Russo’s Marine Mart, Inc.’s motion for summary judgment is ALLOWED, and the defendants Susan G. Harris’s and William Harris’s motion for summary judgment is DENIED.
Judgment shall enter for the plaintiff Russo’s forthwith.

 DMB Financial, LLC is a company that provides individuals with debt settlement services.

 Although Russo’s alleges in its breach of contract claim that it is also entitled to damages for (1) storage fees following delivery of the power boat to Russo’s by Mr. Harris sometime in July 2010 and (2) costs incurred in preparing the power boat for re-sale, these fees and costs do not arise from the breach of the Contract and are instead separate matters. Russo’s implicitly acknowledges this distinction in its motion for summary judgment, as there is no mention of these matters in either its accompanying statement of material facts or its supporting memorandum, and no evidence of these fees and costs appears in the summary judgment record.

 This misrepresentation of the cash down payment, which similarly appeared on a loan application that Russo’s submitted to the bank, would be more applicable to a claim brought by the bank, which arguably relied upon this fact when agreeing to be assigned the Contract. The bank, however, is not a party to this case and the bank and Russo did subsequently enter into the Recourse Agreement, which provided the bank with recourse rights relating to the assignment of certain retail installment sale agreements, including the Contract.

 In paragraph 145 of its answer, Russo’s generally states as a defense to the Harrises’ counterclaim that the Harrises “delayed unreasonably in giving notice of this claim and in bringing this action.” This statement does not specifically mention the Harrises’ G.L.c. 93A claim or raise the issue that the counterclaim contains no allegation that the Harrises sent Russo’s a demand letter pursuant to G.L.c. 93A, §9(3). Moreover, Russo’s makes no mention of this issue in its memorandum supporting its summary judgment motion. Turning to the Harrises, there is no evidence in the record that they sent a demand letter to Russo’s, and the Harrises do not mention sending such a letter in their opposition to the motion by Russo’s.